## CURTIS PUBLISHING CO. *v.* BUTTS.

No. 37.   Argued February 23, 1967.—Decided June 12, 1967.*

---

*Together with No. 150, *Associated Press* v. *Walker,* on certiorari to the Court of Civil Appeals of Texas, 2d Supreme Judicial District.

132

Mr. Justice Black, joined by Mr. Justice Douglas, concluded that in order to dispose of No. 150 he concurs in the grounds stated by The Chief Justice which are summarized in paragraphs 1 and 2, *supra*, of The Chief Justice's conclusions but does not recede from his previously expressed views about the much wider press and speech freedoms of the First and Fourteenth Amendments. P. 170.

Mr. Justice Brennan, joined by Mr. Justice White, concluded that the grounds stated by The Chief Justice which are summarized in paragraphs 1 and 2, *supra*, of The Chief Justice's conclusions in No. 150 govern that case. P. 172.

*Herbert Wechsler* argued the cause for petitioner in No. 37. With him on the brief was *Philip H. Strubing. William P. Rogers* argued the cause for petitioner in No. 150. With him on the briefs were *Leo P. Larkin, Jr., Stanley Godofsky, Arthur Moynihan* and *J. A. Gooch.*

*Allen E. Lockerman* and *William H. Schroder* argued the cause for respondent in No. 37. With them on the brief was *Robert S. Sams. Clyde J. Watts* argued the cause for respondent in No. 150. With him on the brief was *William Andress, Jr.*

*Howard Ellis, Keith Masters, Don H. Reuben* and *Lawrence Gunnels* filed a brief for the Tribune Company, as *amicus curiae,* urging reversal in No. 150.

Mr. Justice Harlan announced the judgments of the Court and delivered an opinion in which Mr. Justice Clark, Mr. Justice Stewart, and Mr. Justice Fortas join.†

In *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 279–280, this Court held that "[t]he constitutional guar-

---

† Five members of the Court, while concurring in the result reached in No. 150, would rest decision on grounds other than those stated in this opinion. See separate opinions of The Chief Justice (*post,* p. 162), of Mr. Justice Black (*post,* p. 170), and of Mr. Justice Brennan (*post,* p. 172).

antees [of freedom of speech and press] require . . . a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." We brought these two cases here, 385 U. S. 811, 385 U. S. 812, to consider the impact of that decision on libel actions instituted by persons who are not public officials, but who are "public figures" and involved in issues in which the public has a justified and important interest. The sweep of the *New York Times* rule in libel actions brought under state law was a question expressly reserved in that case, 376 U. S., at 283, n. 23, and while that question has been involved in later cases, *Garrison* v. *Louisiana,* 379 U. S. 64; *Rosenblatt* v. *Baer,* 383 U. S. 75; *Time, Inc.* v. *Hill,* 385 U. S. 374, it has not been fully settled.

The matter has, however, been passed on by a considerable number of state and lower federal courts and has produced a sharp division of opinion as to whether the *New York Times* rule should apply only in actions brought by public officials or whether it has a longer reach. Compare, *e. g., Pearson* v. *Fairbanks Publishing Co.,* 413 P. 2d 711 (Alaska), with *Clark* v. *Pearson,* 248 F. Supp. 188.[1]

---

[1] See also *Afro-American Publishing Co.* v. *Jaffe,* 125 U. S. App. D. C. 70, 366 F. 2d 649; *Washington Post Co.* v. *Keogh,* 125 U. S. App. D. C. 32, 365 F. 2d 965; *Pauling* v. *Globe-Democrat Publishing Co.,* 362 F. 2d 188; *Pape* v. *Time, Inc.,* 354 F. 2d 558; *Pauling* v. *News Syndicate Co., Inc.,* 335 F. 2d 659; *Fignole* v. *Curtis Publishing Co.,* 247 F. Supp. 595; *Walker* v. *Courier-Journal & Louisville Times Co.,* 246 F. Supp. 231; *United Medical Labs* v. *CBS, Inc.,* 258 F. Supp. 735; *Klahr* v. *Winterble,* 4 Ariz. App. 158, 418 P. 2d 404; *Walker* v. *Associated Press,* —— Colo. ——, 417 P. 2d 486; *Powell* v. *Monitor Publishing Co., Inc.,* 107 N. H. 83, 217 A. 2d 193; *Eadie* v. *Pole,* 91 N. J. Super. 504, 221 A. 2d 547; *State* v. *Browne,* 86 N. J. Super. 217, 206 A. 2d 591; *People*

The resolution of the uncertainty in this area of libel actions requires, at bottom, some further exploration and clarification of the relationship between libel law and the freedom of speech and press, lest the *New York Times* rule become a talisman which gives the press constitutionally adequate protection only in a limited field, or, what would be equally unfortunate, one which goes far to immunize the press from having to make just reparation for the infliction of needless injury upon honor and reputation through false publication. These two libel actions, although they arise out of quite different sets of circumstances, provide that opportunity. We think they are best treated together in one opinion.

## I.

No. 37, *Curtis Publishing Co.* v. *Butts,* stems from an article published in petitioner's Saturday Evening Post which accused respondent of conspiring to "fix" a football game between the University of Georgia and the University of Alabama, played in 1962. At the time of the article, Butts was the athletic director of the University of Georgia and had overall responsibility for the administration of its athletic program. Georgia is a state university, but Butts was employed by the Georgia Athletic Association, a private corporation, rather than by the State itself.[2] Butts had previously served as head

---

v. *Mager,* 25 App. Div. 2d 363, 269 N. Y. S. 2d 848; *Gilberg* v. *Goffi,* 21 App. Div. 2d 517, 251 N. Y. S. 2d 823; *Krutech* v. *Schimmel,* 50 Misc. 2d 1052, 272 N. Y. S. 2d 261; *Cabin* v. *Community Newspapers, Inc.,* 50 Misc. 2d 574, 270 N. Y. S. 2d 913; *Pauling* v. *National Review,* 49 Misc. 2d 975, 269 N. Y. S. 2d 11; *Block* v. *Benton,* 44 Misc. 2d 1053, 255 N. Y. S. 2d 767; *Fegley* v. *Morthimer,* 204 Pa. Super. 54, 202 A. 2d 125; *Tucker* v. *Kilgore,* 388 S. W. 2d 112 (Ky.).

[2] In *Allen* v. *Regents of the University System of Georgia,* 304 U. S. 439, this Court described the Athletic Association as a body carrying on "a business comparable in all essentials to those usually

football coach of the University and was a well-known and respected figure in coaching ranks. He had maintained an interest in coaching and was negotiating for a position with a professional team at the time of publication.

The article was entitled "The Story of a College Football Fix" and prefaced by a note from the editors stating: "Not since the Chicago White Sox threw the 1919 World Series has there been a sports story as shocking as this one. . . . Before the University of Georgia played the University of Alabama . . . Wally Butts . . . gave [to its coach] . . . Georgia's plays, defensive patterns, all the significant secrets Georgia's football team possessed." The text revealed that one George Burnett, an Atlanta insurance salesman, had accidentally overheard, because of electronic error, a telephone conversation between Butts and the head coach of the University of Alabama, Paul Bryant, which took place approximately one week prior to the game. Burnett was said to have listened while "Butts outlined Georgia's offensive plays . . . and told . . . how Georgia planned to defend . . . . Butts mentioned both players and plays by name." The readers were told that Burnett had made notes of the conversation, and specific examples of the divulged secrets were set out.

The article went on to discuss the game and the players' reaction to the game, concluding that "[t]he Georgia players, their moves analyzed and forecast like those of rats in a maze, took a frightful physical beating," and said that the players, and other sideline observers, were aware that Alabama was privy to Georgia's secrets. It set out the series of events commencing with Burnett's later presentation of his notes to the Georgia head coach,

conducted by private owners." *Id.*, at 451. Section 32–153 of the Georgia Code specifically provides that athletic associations are not to be considered agencies of the State.

Johnny Griffith, and culminating in Butts' resignation from the University's athletic affairs, for health and business reasons. The article's conclusion made clear its expected impact:

"The chances are that Wally Butts will never help any football team again. . . . The investigation by university and Southeastern Conference officials is continuing; motion pictures of other games are being scrutinized; where it will end no one so far can say. But careers will be ruined, that is sure."

Butts brought this diversity libel action in the federal courts in Georgia seeking $5,000,000 compensatory and $5,000,000 punitive damages. The complaint was filed, and the trial completed, before this Court handed down its decision in *New York Times,* and the only defense raised by petitioner Curtis was one of substantial truth. No constitutional defenses were interposed although Curtis' counsel were aware of the progress of the *New York Times* case, and although general constitutional defenses had been raised by Curtis in a libel action instituted by the Alabama coach who was a state employee.

Evidence at trial was directed both to the truth of the article and to its preparation. The latter point was put in issue by the claim for punitive damages which required a finding of "malice" under Georgia law. The evidence showed that Burnett had indeed overheard a conversation between Butts and the Alabama coach, but the content of that conversation was hotly disputed. It was Butts' contention that the conversation had been general football talk and that nothing Burnett had overheard would have been of any particular value to an opposing coach. Expert witnesses supported Butts by analyzing Burnett's notes and the films of the game itself. The Saturday Evening Post's version of the game and of the players' remarks about the game was severely contradicted.

138

The evidence on the preparation of the article, on which we shall focus in more detail later, cast serious doubt on the adequacy of the investigation underlying the article. It was Butts' contention that the magazine had departed greatly from the standards of good investigation and reporting and that this was especially reprehensible, amounting to reckless and wanton conduct, in light of the devastating nature of the article's assertions.

The jury was instructed that in order for the defense of truth to be sustained it was "necessary that the truth be substantially portrayed in those parts of the article which libel the plaintiff." The "sting of the libel" was said to be "the charge that the plaintiff rigged and fixed the 1962 Georgia-Alabama game by giving Coach Bryant [of Alabama] information which was calculated to or could have affected the outcome of the game." The jury was also instructed that it could award punitive damages "to deter the wrong-doer from repeating the trespass" in an amount within its sole discretion if it found that actual malice had been proved.[3]

The jury returned a verdict for $60,000 in general damages and for $3,000,000 in punitive damages. The trial court reduced the total to $460,000 by remittitur. Soon thereafter we handed down our decision in *New York Times* and Curtis immediately brought it to the attention of the trial court by a motion for new trial. The trial judge rejected Curtis' motion on two grounds. He

[3] Actual malice was defined by the charge as encompassing "the notion of ill will, spite, hatred and an intent to injure one. Malice also denotes a wanton or reckless indifference or culpable negligence with regard to the rights of others." The jury was told that whether "actual malice or wanton or reckless indifference has been established must be determined from all of the evidence in the case." The trial court then directed the jury's attention to the circumstances of preparation. The impact of the charge is considered in more detail at 156–158, *infra*.

first held that *New York Times* was inapplicable because Butts was not a public official. He also held that "there was ample evidence from which a jury could have concluded that there was reckless disregard by defendant of whether the article was false or not."

Curtis appealed to the Court of Appeals for the Fifth Circuit which affirmed the judgment of the District Court by a two-to-one vote. The majority there did not reach the merits of petitioner's constitutional claim, holding that Curtis had "clearly waived any right it may have had to challenge the verdict and judgment on any of the constitutional grounds asserted in Times," 351 F. 2d 702, 713, on the basis of *Michel* v. *Louisiana,* 350 U. S. 91. It found Curtis chargeable with knowledge of the constitutional limitations on libel law at the time it filed its pleadings below because of its "interlocking battery of able and distinguished attorneys" some of whom were involved in the *New York Times* litigation. This holding rendered the compensatory damage decision purely one of state law and no error was found in its application. Turning to the punitive damage award, the majority upheld it as stemming from the "enlightened conscience" of the jury as adjusted by the lawful action of the trial judge. It was in "complete accord" with the trial court's determination that the evidence justified the finding "that what the Post did was done with reckless disregard of whether the article was false or not." 351 F. 2d, at 719.

Judge Rives dissented, arguing that the record did not support a finding of knowing waiver of constitutional defenses. He concluded that the *New York Times* rule was applicable because Butts was involved in activities of great interest to the public. He would have reversed because "the jury might well have understood the district court's charge to allow recovery on a showing of

intent to inflict harm or even the culpably negligent infliction of harm, rather than the intent to inflict harm through falsehood . . . ." 351 F. 2d, at 723.

Rehearing was denied, 351 F. 2d, at 733, and we granted certiorari, as indicated above. For reasons given below, we would affirm.

## II.

No. 150, *Associated Press* v. *Walker,* arose out of the distribution of a news dispatch giving an eyewitness account of events on the campus of the University of Mississippi on the night of September 30, 1962, when a massive riot erupted because of federal efforts to enforce a court decree ordering the enrollment of a Negro, James Meredith, as a student in the University. The dispatch stated that respondent Walker, who was present on the campus, had taken command of the violent crowd and had personally led a charge against federal marshals sent there to effectuate the court's decree and to assist in preserving order. It also described Walker as encouraging rioters to use violence and giving them technical advice on combating the effects of tear gas.

Walker was a private citizen at the time of the riot and publication. He had pursued a long and honorable career in the United States Army before resigning to engage in political activity, and had, in fact, been in command of the federal troops during the school segregation confrontation at Little Rock, Arkansas, in 1957. He was acutely interested in the issue of physical federal intervention, and had made a number of strong statements against such action which had received wide publicity. Walker had his own following, the "Friends of Walker," and could fairly be deemed a man of some political prominence.

Walker initiated this libel action in the state courts of Texas, seeking a total of $2,000,000 in compensatory and punitive damages. Associated Press raised both the

defense of truth and constitutional defenses. At trial both sides attempted to reconstruct the stormy events on the campus of the University of Mississippi. Walker admitted his presence on the campus and conceded that he had spoken to a group of students. He claimed, however, that he had counseled restraint and peaceful protest, and exercised no control whatever over the crowd which had rejected his plea. He denied categorically taking part in any charge against the federal marshals.

There was little evidence relating to the preparation of the news dispatch. It was clear, however, that the author of this dispatch, Van Savell, was actually present during the events described and had reported them almost immediately to the Associated Press office in Atlanta. A discrepancy was shown between an oral account given the office and a later written dispatch, but it related solely to whether Walker had spoken to the group before or after approaching the marshals. No other showing of improper preparation was attempted, nor was there any evidence of personal prejudice or incompetency on the part of Savell or the Associated Press.

The jury was instructed that an award of compensatory damages could be made if the dispatch was not substantially true,[4] and that punitive damages could be added if the article was actuated by "ill will, bad or evil motive, or that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person to be affected by it."

A verdict of $500,000 compensatory damages and $300,000 punitive damages was returned. The trial judge, however, found that there was "no evidence to support the jury's answers that there was actual malice"

---

[4] Two particular statements were at issue, the remark that "Walker assumed command of the crowd," and the accusation that Walker led a charge against the marshals.

and refused to enter the punitive award. He concluded that the failure further to investigate the minor discrepancy between the oral and written versions of the incident could not "be construed as that *entire want of care* which would amount to a *conscious indifference* to the rights of plaintiff. Negligence, it may have been; malice, it was not. Moreover, the mere fact that AP permitted a young reporter to cover the story of the riot is not evidence of malice." (Emphasis in original.) The trial judge also noted that this lack of "malice" would require a verdict for the Associated Press if *New York Times* were applicable. But he rejected its applicability since there were "no compelling reasons of public policy requiring additional defenses to suits for libel. Truth alone should be an adequate defense."

Both sides appealed and the Texas Court of Civil Appeals affirmed both the award of compensatory damages and the striking of punitive damages. It stated without elaboration that *New York Times* was inapplicable. As to the punitive damage award, the plea for reinstatement was refused because "[i]n view of all the surrounding circumstances, the rapid and confused occurrence of events on the occasion in question, and in the light of all the evidence, we hold that appellee failed to prove malice . . . ." 393 S. W. 2d 671, 683.

The Supreme Court of Texas denied a writ of error, and we granted certiorari, as already indicated. For reasons given below, we would reverse.

### III.

Before we reach the constitutional arguments put forward by the respective petitioners, we must first determine whether Curtis has waived its right to assert such arguments by failing to assert them before trial. As our dispositions of *Rosenblatt* v. *Baer,* 383 U. S. 75,

and other cases involving constitutional questions indicate,[5] the mere failure to interpose such a defense prior to the announcement of a decision which might support it cannot prevent a litigant from later invoking such a ground. Of course it is equally clear that even constitutional objections may be waived by a failure to raise them at a proper time, *Michel* v. *Louisiana, supra,* at 99,[6] but an effective waiver must, as was said in *Johnson* v. *Zerbst,* 304 U. S. 458, 464, be one of a "known right or privilege."

Butts makes two arguments in support of his contention that Curtis' failure to raise constitutional defenses amounted to a knowing waiver. The first is that the general state of the law at the time of this trial was such that Curtis should, in the words of the Fifth Circuit majority, have seen "the handwriting on the wall." 351 F. 2d, at 734. We cannot accept this contention. Although our decision in *New York Times* did draw upon earlier precedents in state law, *e. g., Coleman* v. *MacLennan,* 78 Kan. 711, 98 P. 281, and there were intimations in a prior opinion and the extra-judicial comments of one Justice,[7] that some applications of libel law might be in conflict with the guarantees of free speech and press, there was strong precedent indicating that civil libel actions

---

[5] See *Tehan* v. *Shott,* 382 U. S. 406, 409, n. 3; *Linkletter* v. *Walker,* 381 U. S. 618, 622–629; *Griffin* v. *California,* 380 U. S. 609; *White* v. *Maryland,* 373 U. S. 59.

[6] See also *Ackermann* v. *United States,* 340 U. S. 193, 198.

[7] In *Beauharnais* v. *Illinois,* 343 U. S. 250, the Court had upheld an Illinois group libel statute but the majority had warned that " 'While this Court sits' it retains and exercises authority to nullify action which encroaches on freedom of utterance under the guise of punishing libel." *Id.,* at 263–264. There were also four vigorous dissenters to the holding in that case. An article appearing in the June 1962 New York University Law Review had quoted MR. JUSTICE BLACK as believing that "there should be no libel or defamation law in the United States . . . ." Cahn, Justice Black and First Amendment "Absolutes": A Public Interview, 37 N. Y. U. L. Rev. 549, 557.

were immune from general constitutional scrutiny.[8] Given the state of the law prior to our decision in *New York Times,* we do not think it unreasonable for a lawyer trying a case of this kind, where the plaintiff was not even a public official under state law, to have looked solely to the defenses provided by state libel law. Nor do we think that the previous grant of certiorari in *New York Times* alone indicates a different conclusion. The questions presented for review there were premised on Sullivan's status as an elected public official, and elected officials traditionally have been subject to special rules of libel law.[9]

Butts' second contention is that whatever defenses might reasonably have been apparent to the average lawyer, some of Curtis' trial attorneys were involved in the *New York Times* litigation and thus should have been especially alert to constitutional contentions. This was the argument which swayed the Court of Appeals, but we do not find it convincing.

First, as a general matter, we think it inadvisable to determine whether a "right or privilege" is "known" by relying on information outside the record concerning the special legal knowledge of particular attorneys. Second, even a lawyer fully cognizant of the record and briefs in the *New York Times* litigation might reasonably have expected the resolution of that case to have no impact

---

[8] In *Robertson* v. *Baldwin,* 165 U. S. 275, 281, the Court said: "Thus, the freedom of speech and of the press (art. 1) does not permit the publication of libels, blasphemous or indecent articles, or other publications injurious to public morals or private reputation . . . ." That sentiment was repeated in a number of cases including *Beauharnais* v. *Illinois, supra,* n. 7. See *Near* v. *Minnesota,* 283 U. S. 697, 715; *Chaplinsky* v. *New Hampshire,* 315 U. S. 568.

[9] See, *e. g., Sweeney* v. *Patterson,* 76 U. S. App. D. C. 23, 128 F. 2d 457; *Hendrix* v. *Mobile Register,* 202 Ala. 616, 81 So. 558.

on this litigation, since the arguments advanced there depended so heavily on the analogy to seditious libel. We think that it was our eventual resolution of *New York Times,* rather than its facts and the arguments presented by counsel, which brought out the constitutional question here. We would not hold that Curtis waived a "known right" before it was aware of the *New York Times* decision. It is agreed that Curtis' presentation of the constitutional issue after our decision in *New York Times* was prompt.

Our rejection of Butts' arguments is supported by factors which point to the justice of that conclusion. See *Hormel* v. *Helvering,* 312 U. S. 552, 556–557. Curtis' constitutional points were raised early enough so that this Court has had the benefit of some ventilation of them by the courts below. The resolution of the merits of Curtis' contentions by the District Court makes it evident that Butts was not prejudiced by the time at which Curtis raised its argument, for it cannot be asserted that an earlier interposition would have resulted in any different proceedings below.[10] Finally the constitutional protection which Butts contends that Curtis has waived safeguards a freedom which is the "matrix, the indispensable condition, of nearly every other form of freedom." *Palko* v. *Connecticut,* 302 U. S. 319, 327. Where the ultimate effect of sustaining a claim of waiver might be an imposition on that valued freedom, we are unwilling to find waiver in circumstances which fall short of being clear and compelling. Cf. *New York Times Co.* v. *Connor,* 365 F. 2d 567, 572.

---

[10] Even after our decision in *New York Times* was before him, the trial judge held it inapplicable. It is almost certain that he would have rebuffed any effort to interpose general constitutional defenses at the time of trial. See Comment, Waiver of a Previously Unrecognized Defense: Must Lawyers Be Seers?, 114 U. Pa. L. Rev. 451.

## IV.

We thus turn to a consideration, on the merits, of the constitutional claims raised by Curtis in *Butts* and by the Associated Press in *Walker*. Powerful arguments are brought to bear for the extension of the *New York Times* rule in both cases. In *Butts* it is contended that the facts are on all fours with those of *Rosenblatt v. Baer, supra,* since Butts was charged with the important responsibility of managing the athletic affairs of a state university. It is argued that while the Athletic Association is financially independent from the State and Butts was not technically a state employee, as was Baer, his role in state administration was so significant that this technical distinction from *Rosenblatt* should be ignored. Even if this factor is to be given some weight, we are told that the public interest in education in general, and in the conduct of the athletic affairs of educational institutions in particular, justifies constitutional protection of discussion of persons involved in it equivalent to the protection afforded discussion of public officials.

A similar argument is raised in the *Walker* case where the important public interest in being informed about the events and personalities involved in the Mississippi riot is pressed. In that case we are also urged to recognize that Walker's claims to the protection of libel laws are limited since he thrust himself into the "vortex" of the controversy.

We are urged by the respondents, Butts and Walker, to recognize society's "pervasive and strong interest in preventing and redressing attacks upon reputation," and the "important social values which underlie the law of defamation." *Rosenblatt v. Baer, supra,* at 86. It is pointed out that the publicity in these instances was not directed at employees of government and that these cases cannot be analogized to seditious libel prosecutions. *Id.,* at 92 (STEWART, J., concurring). We are

told that "[t]he rule that permits satisfaction of the deep-seated need for vindication of honor is not a mere historic relic, but promotes the law's civilizing function of providing an acceptable substitute for violence in the settlement of disputes," *Afro-American Publishing Co.* v. *Jaffe,* 125 U. S. App. D. C. 70, 81, 366 F. 2d 649, 660, and that:

> "Newspapers, magazines, and broadcasting companies are businesses conducted for profit and often make very large ones. Like other enterprises that inflict damage in the course of performing a service highly useful to the public . . . they must pay the freight; and injured persons should not be relegated [to remedies which] make collection of their claims difficult or impossible unless strong policy considerations demand." *Buckley* v. *New York Post Corp.,* 373 F. 2d 175, 182.

We fully recognize the force of these competing considerations and the fact that an accommodation between them is necessary not only in these cases, but in all libel actions arising from a publication concerning public issues. In *Time, Inc.* v. *Hill,* 385 U. S. 374, 388, we held that "[t]he guarantees for speech and press are not the preserve of political expression or comment upon public affairs . . ." and affirmed that freedom of discussion "must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill* v. *Alabama,* 310 U. S. 88, 102. This carries out the intent of the Founders who felt that a free press would advance "truth, science, morality, and arts in general" as well as responsible government. Letter to the Inhabitants of Quebec, 1 Journals of the Continental Cong. 108. From the point of view of deciding whether a constitutional interest of free speech and press is properly involved in the resolution of a libel question a rational

distinction "cannot be founded on the assumption that criticism of private citizens who seek to lead in the determination of . . . policy will be less important to the public interest than will criticism of government officials." *Pauling* v. *Globe-Democrat Publishing Co.,* 362 F. 2d 188, 196.

On the other hand, to take the rule found appropriate in *New York Times* to resolve the "tension" between the particular constitutional interest there involved and the interests of personal reputation and press responsibility, *Rosenblatt* v. *Baer, supra,* at 86, as being applicable throughout the realm of the broader constitutional interest, would be to attribute to this aspect of *New York Times* an unintended inexorability at the threshold of this new constitutional development. In *Time, Inc.* v. *Hill, supra,* at 390, we counseled against "blind application of *New York Times Co.* v. *Sullivan*" and considered "the factors which arise in the particular context." Here we must undertake a parallel evaluation.[11]

The modern history of the guarantee of freedom of speech and press mainly has been one of a search for the outer limits of that right. From the fountainhead opinions of Justices Holmes and Brandeis in *Schenck, Abrams,* and *Whitney,*[12] which considered the problem when the disruptive effects of speech might strip the protection from the speaker, to our recent decision in *Adderley* v. *Florida,* 385 U. S. 39, where we found freedom of speech not to include a freedom to trespass, the Court's primary concern has been to determine the extent of the right and the surrounding safeguards necessary to give it "breathing space." *NAACP* v.

---

[11] The majority opinion in *Time, Inc.* v. *Hill,* 385 U. S. 374, was limited to the consideration of nondefamatory matter. *Id.,* at 391.

[12] *Schenck* v. *United States,* 249 U. S. 47 (Holmes, J.); *Abrams* v. *United States,* 250 U. S. 616, 624 (Holmes, J., dissenting); *Whitney* v. *California,* 274 U. S. 357, 372 (Brandeis, J., concurring).

*Button,* 371 U. S. 415, 433. That concern has perhaps omitted from searching consideration the "real problem" of defining or delimiting the right itself. See Freund, Mr. Justice Black and the Judicial Function, 14 U. C. L. A. L. Rev. 467, 471.

It is significant that the guarantee of freedom of speech and press falls between the religious guarantees and the guarantee of the right to petition for redress of grievances in the text of the First Amendment, the principles of which are carried to the States by the Fourteenth Amendment. It partakes of the nature of both, for it is as much a guarantee to individuals of their personal right to make their thoughts public and put them before the community, see Holt, Of the Liberty of the Press, in Nelson, Freedom of the Press from Hamilton to the Warren Court 18–19, as it is a social necessity required for the "maintenance of our political system and an open society." *Time, Inc.* v. *Hill, supra,* at 389. It is because of the personal nature of this right that we have rejected all manner of prior restraint on publication, *Near* v. *Minnesota,* 283 U. S. 697, despite strong arguments that if the material was unprotected the time of suppression was immaterial. Pound, Equitable Relief Against Defamation and Injuries to Personality, 29 Harv. L. Rev. 640. The dissemination of the individual's opinions on matters of public interest is for us, in the historic words of the Declaration of Independence, an "unalienable right" that "governments are instituted among men to secure." History shows us that the Founders were not always convinced that unlimited discussion of public issues would be "for the benefit of all of us" [13] but that they firmly adhered to the proposition that the "true liberty of the press" permitted "every man to publish

---

[13] See Levy, Legacy of Suppression. The phrase is from the Court's opinion in *Time, Inc.* v. *Hill, supra,* at 389.

his opinion." *Respublica* v. *Oswald,* 1 Dall. 319, 325 (Pa.).

The fact that dissemination of information and opinion on questions of public concern is ordinarily a legitimate, protected and indeed cherished activity does not mean, however, that one may in all respects carry on that activity exempt from sanctions designed to safeguard the legitimate interests of others. A business "is not immune from regulation because it is an agency of the press. The publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others." *Associated Press* v. *Labor Board,* 301 U. S. 103, 132–133. Federal securities regulation,[14] mail fraud statutes,[15] and common-law actions for deceit and misrepresentation [16] are only some examples of our understanding that the right to communicate information of public interest is not "unconditional." See Note, Freedom of Expression in a Commercial Context, 78 Harv. L. Rev. 1191. However, as our decision in *New York Times* makes explicit, while protected activity may in some respects be subjected to sanctions, it is not open to all forms of regulation. The guarantees of freedom of speech and press were not designed to prevent "the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential . . . ." 2 Cooley, Constitutional Limitations 886 (8th ed.). Our touchstones are that acceptable

---

[14] *E. g.,* 48 Stat. 82, as amended, 15 U. S. C. § 77k (penalizing negligent misstatement).

[15] 18 U. S. C. § 1341.

[16] See *Traylor Engineering & Mfg. Co.* v. *National Container Corp.,* 45 Del. 143, 70 A. 2d 9; Restatement, Torts § 525 (deceit); *Nash* v. *Minnesota Title Ins. & Trust Co.,* 163 Mass. 574, 40 N. E. 1039 (negligent misrepresentation).

limitations must neither affect "the impartial distribution of news" and ideas, *Associated Press* v. *Labor Board, supra,* at 133, nor because of their history or impact constitute a special burden on the press, *Grosjean* v. *American Press Co., Inc.,* 297 U. S. 233, nor deprive our free society of the stimulating benefit of varied ideas because their purveyors fear physical or economic retribution solely because of what they choose to think and publish.

The history of libel law leaves little doubt that it originated in soil entirely different from that which nurtured these constitutional values. Early libel was primarily a criminal remedy, the function of which was to make punishable any writing which tended to bring into disrepute the state, established religion, or any individual likely to be provoked to a breach of the peace because of the words. Truth was no defense in such actions and while a proof of truth might prevent recovery in a civil action, this limitation is more readily explained as a manifestation of judicial reluctance to enrich an undeserving plaintiff than by the supposition that the defendant was protected by the truth of the publication. The same truthful statement might be the basis of a criminal libel action. See *Commonwealth* v. *Clap,* 4 Mass. 163; see generally Veeder, The History and Theory of the Law of Defamation, 3 Col. L. Rev. 546, 4 Col. L. Rev. 33.

The law of libel has, of course, changed substantially since the early days of the Republic, and this change is "the direct consequence of the friction between it . . . and the highly cherished right of free speech." *State* v. *Browne,* 86 N. J. Super. 217, 228, 206 A. 2d 591, 597. The emphasis has shifted from criminal to civil remedies, from the protection of absolute social values to the safeguarding of valid personal interests. Truth has become an absolute defense in almost all cases,[17] and privileges designed to foster free communication are almost uni-

---

[17] See 1 Harper & James, The Law of Torts § 5.20.

versally recognized.[18]  But the basic theory of libel has
not changed, and words defamatory of another are still
placed "in the same class with the use of explosives or
the keeping of dangerous animals." Prosser, The Law of
Torts § 108, at 792. Thus some antithesis between free-
dom of speech and press and libel actions persists, for libel
remains premised on the content of speech and limits the
freedom of the publisher to express certain sentiments,
at least without guaranteeing legal proof of their sub-
stantial accuracy.

While the truth of the underlying facts might be said
to mark the line between publications which are of
significant social value and those which might be sup-
pressed without serious social harm and thus resolve the
antithesis on a neutral ground, we have rejected, in prior
cases involving materials and persons commanding justi-
fied and important public interest, the argument that a
finding of falsity alone should strip protections from the
publisher. *New York Times Co.* v. *Sullivan, supra,* at
272. We have recognized "the inevitability of some errror
in the situation presented in free debate," *Time, Inc.* v.
*Hill, supra,* at 406 (opinion of this writer), and that
"putting to the pre-existing prejudices of a jury the
determination of what is 'true' may effectively institute
a system of censorship."

Our resolution of *New York Times Co.* v. *Sullivan,* in
the context of the numerous statutes and cases which
allow ideologically neutral, and generally applicable regu-
latory measures to be applied to publication, makes clear,
however, that neither the interests of the publisher nor
those of society necessarily preclude a damage award

---

[18] Some privileges such as the one pertaining to reports of judicial
proceedings are recognized as absolute. Others, such as the fair-
comment privilege are recognized only as conditional privileges and
may be vitiated by proof of actual malice. See generally Prosser,
The Law of Torts §§ 109, 110.

based on improper conduct which creates a false publication. It is the conduct element, therefore, on which we must principally focus if we are successfully to resolve the antithesis between civil libel actions and the freedom of speech and press. Impositions based on misconduct can be neutral with respect to content of the speech involved, free of historical taint, and adjusted to strike a fair balance between the interests of the community in free circulation of information and those of individuals in seeking recompense for harm done by the circulation of defamatory falsehood.

In *New York Times* we were adjudicating in an area which lay close to seditious libel, and history dictated extreme caution in imposing liability. The plaintiff in that case was an official whose position in government was such "that the public [had] an independent interest in the qualifications and performance of the person who [held] it." *Rosenblatt* v. *Baer, supra,* at 86. Such officials usually enjoy a privilege against libel actions for their utterances, see, *e. g., Barr* v. *Matteo,* 360 U. S. 564, and there were analogous considerations involved in *New York Times, supra,* at 282. Thus we invoked "the hypothesis that speech can rebut speech, propaganda will answer propaganda, free debate of ideas will result in the wisest governmental policies," *Dennis* v. *United States,* 341 U. S. 494, 503, and limited recovery to those cases where "calculated falsehood" placed the publisher "at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected." *Garrison* v. *Louisiana,* 379 U. S. 64, 75. That is to say, such officials were permitted to recover in libel only when they could prove that the publication involved was deliberately falsified, or published recklessly despite the publisher's awareness of probable falsity. Investigatory failures alone were held insufficient to satisfy this standard. See *New York*

*Times,* at 286–288, 292; *Garrison* v. *Louisiana, supra,* at 73–75, 79.

In the cases we decide today none of the particular considerations involved in *New York Times* is present. These actions cannot be analogized to prosecutions for seditious libel. Neither plaintiff has any position in government which would permit a recovery by him to be viewed as a vindication of governmental policy. Neither was entitled to a special privilege protecting his utterances against accountability in libel. We are prompted, therefore, to seek guidance from the rules of liability which prevail in our society with respect to compensation of persons injured by the improper performance of a legitimate activity by another. Under these rules, a departure from the kind of care society may expect from a reasonable man performing such activity leaves the actor open to a judicial shifting of loss. In defining these rules, and especially in formulating the standards for determining the degree of care to be expected in the circumstances, courts have consistently given much attention to the importance of defendants' activities. Prosser, The Law of Torts § 31, at 151. The courts have also, especially in libel cases, investigated the plaintiff's position to determine whether he has a legitimate call upon the court for protection in light of his prior activities and means of self-defense. See *Brewer* v. *Hearst Publishing Co.,* 185 F. 2d 846; *Flanagan* v. *Nicholson Publishing Co.,* 137 La. 588, 68 So. 964. We note that the public interest in the circulation of the materials here involved, and the publisher's interest in circulating them, is not less than that involved in *New York Times.* And both Butts and Walker commanded a substantial amount of independent public interest at the time of the publications; both, in our opinion, would have been labeled "public figures" under ordinary tort rules. See *Spahn* v. *Julian Messner, Inc.,* 18 N. Y. 2d 324, 221 N. E. 2d 543, re-

manded on other grounds, 387 U. S. 239. Butts may have attained that status by position alone and Walker by his purposeful activity amounting to a thrusting of his personality into the "vortex" of an important public controversy, but both commanded sufficient continuing public interest and had sufficient access to the means of counterargument to be able "to expose through discussion the falsehood and fallacies" of the defamatory statements. *Whitney* v. *California,* 274 U. S. 357, 377 (Brandeis, J., dissenting).

These similarities and differences between libel actions involving persons who are public officials and libel actions involving those circumstanced as were Butts and Walker, viewed in light of the principles of liability which are of general applicability in our society, lead us to the conclusion that libel actions of the present kind cannot be left entirely to state libel laws, unlimited by any overriding constitutional safeguard, but that the rigorous federal requirements of *New York Times* are not the only appropriate accommodation of the conflicting interests at stake. We consider and would hold that a "public figure" who is not a public official may also recover damages for a defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers. Cf. Sulzberger, Responsibility and Freedom, in Nelson, Freedom of the Press from Hamilton to the Warren Court 409, 412.

Nothing in this opinion is meant to affect the holdings in *New York Times* and its progeny, including our recent decision in *Time, Inc.* v. *Hill.*[19]

---

[19] Nor does anything we have said touch, in any way, libel or other tort actions not involving public figures or matters of public interest.

## V.

Having set forth the standard by which we believe the constitutionality of the damage awards in these cases must be judged, we turn now, as the Court did in *New York Times,* to the question whether the evidence and findings below meet that standard. We find the standard satisfied in No. 37, *Butts,* and not satisfied by either the evidence or the findings in No. 150, *Walker.*

The *Butts* jury was instructed, in considering punitive damages, to assess "the reliability, the nature of the sources of the defendant's information, its acceptance or rejection of the sources, and its care in checking upon assertions." These considerations were said to be relevant to a determination whether defendant had proceeded with "wanton and reckless indifference." In this light we consider that the jury must have decided that the investigation undertaken by the Saturday Evening Post, upon which much evidence and argument was centered,[20] was grossly inadequate in the circumstances. The impact of a jury instruction "is not to be ascertained by

---

[20] Counsel for Butts continually pressed upon the jury in argument that the defendant had failed to exercise a minimum of care. He did not seriously contend that the Saturday Evening Post was actuated by pre-existing animosity toward Butts. Arguing that the misquotations which were shown to be present were proof of malice he stated: "I say that is not fair journalism; I say that is not true, careful reporting." After reviewing the failure of Curtis to interview Carmichael (see p. 157, *infra*) or to check the game films, he asked the jury: "Again, is that good reporting? Is that what the field or the profession of journalism owes you and owes me . . . when it is getting ready to write an article which it knows and which it states therein that it is going to ruin us . . . ." The gist of Butts' contention on "actual malice" was that Curtis had been anxious to publish an exposé and had thus wantonly and recklessly seized on a questionable affidavit from Burnett. It is this theory which we feel that the jury must have accepted in awarding punitive damages.

merely considering isolated statements but by taking into view all the instructions given and the tendencies of the proof in the case to which they could possibly be applied." *Seaboard Air Line R. Co.* v. *Padgett,* 236 U. S. 668, 672.

This jury finding was found to be supported by the evidence by the trial judge and the majority in the Fifth Circuit. Given the extended history of the case, the amount of the evidence pointing to serious deficiencies in investigatory procedure, and the severe harm inflicted on Butts, we would not feel justified in ordering a retrial of the compensatory damage issue, either on the theory that this aspect of the case was submitted to the jury only under the issue of "truth," [21] or on the very slim possibility that the jury finding regarding punitive damages might have been based on Curtis' attitude toward Butts rather than on Curtis' conduct.

The evidence showed that the Butts story was in no sense "hot news" and the editors of the magazine recognized the need for a thorough investigation of the serious charges. Elementary precautions were, nevertheless, ignored. The Saturday Evening Post knew that Burnett had been placed on probation in connection with bad check charges, but proceeded to publish the story on the basis of his affidavit without substantial independent support. Burnett's notes were not even viewed by any of the magazine's personnel prior to publication. John Carmichael who was supposed to have been with Burnett when the phone call was overheard was not interviewed. No attempt was made to screen the films of the game to see if Burnett's information was accurate, and no attempt was made to find out whether Alabama had adjusted its plans after the alleged divulgence of information.

---

[21] It is inconceivable that the jury might have treated the "investigatory" evidence differently if it had been presented with respect to compensatory damages rather than with regard to punitive damages.

158

The Post writer assigned to the story was not a football expert and no attempt was made to check the story with someone knowledgeable in the sport. At trial such experts indicated that the information in the Burnett notes was either such that it would be evident to any opposing coach from game films regularly exchanged or valueless. Those assisting the Post writer in his investigation were already deeply involved in another libel action, based on a different article, brought against Curtis Publishing Co. by the Alabama coach and unlikely to be the source of a complete and objective investigation. The Saturday Evening Post was anxious to change its image by instituting a policy of "sophisticated muckraking," and the pressure to produce a successful exposé might have induced a stretching of standards. In short, the evidence is ample to support a finding of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.

The situation in *Walker* is considerably different. There the trial court found the evidence insufficient to support more than a finding of even ordinary negligence and the Court of Civil Appeals supported the trial court's view of the evidence. Ordinarily we would, under the governing constitutional standard, reverse the decision below on the concurrent findings rule. *Graver Tank & Mfg. Co.* v. *Linde Air Products Co.,* 336 U. S. 271, 275. But, as in *New York Times,* we think it better to face for ourselves the question whether there is sufficient evidence to support the finding we would require.

In contrast to the *Butts* article, the dispatch which concerns us in *Walker* was news which required immediate dissemination. The Associated Press received the information from a correspondent who was present at the scene of the events and gave every indication of being trustworthy and competent. His dispatches in this in-

stance, with one minor exception, were internally consistent and would not have seemed unreasonable to one familiar with General Walker's prior publicized statements on the underlying controversy.[22]  Considering the necessity for rapid dissemination, nothing in this series of events gives the slightest hint of a severe departure from accepted publishing standards.  We therefore conclude that General Walker should not be entitled to damages from the Associated Press.

## VI.

We come finally to Curtis' contention that whether or not it can be required to compensate Butts for any injury it may have caused him, it cannot be subjected to an assessment for punitive damages limited only by the "enlightened conscience" of the community.  Curtis recognizes that the Constitution presents no general bar to the assessment of punitive damages in a civil case, *Day* v. *Woodworth,* 13 How. 363, 370–371, but contends that an unlimited punitive award against a magazine publisher constitutes an effective prior restraint by giving the jury the power to destroy the publisher's business.  We cannot accept this reasoning.  Publishers like Curtis engage in a wide variety of activities which may

---

[22] On September 26, 1962, Walker had made a statement on radio station KWKH at Shreveport, Louisiana, urging people to "[r]ise to a stand beside Governor Ross Barnett at Jackson, Mississippi." He contended that the people had "talked, listened and been pushed around far too much . . . ." He promised that he would "be there," on "the right side." The next morning in a television appearance in Dallas he repeated the same sentiments, and he set out his views once again from New Orleans on the evening of September 28, 1962.  On September 29, 1962, Walker arrived in Jackson, Mississippi, and held another press and television conference in which he called for "violent vocal protest."  On the afternoon of September 30, 1962, Walker held a final press conference at which he again urged defiance of court orders and federal power.

lead to tort suits where punitive damages are a possibility. To exempt a publisher, because of the nature of his calling, from an imposition generally exacted from other members of the community, would be to extend a protection not required by the constitutional guarantee. *Associated Press* v. *Labor Board,* 301 U. S. 103. We think the constitutional guarantee of freedom of speech and press is adequately served by judicial control over excessive jury verdicts, manifested in this instance by the trial court's remittitur, and by the general rule that a verdict based on jury prejudice cannot be sustained even when punitive damages are warranted. See, *e. g., Minneapolis, St. P. & S. S. M. R. Co.* v. *Moquin,* 283 U. S. 520, 521.

Despite this conclusion, it might be argued that an award of punitive damages cannot be justified constitutionally by the same degree of misconduct required to support a compensatory award. The usual rule in libel actions, and other state-created tort actions, is that a higher degree of fault is necessary to sustain a punitive imposition than a compensatory award. And it might be asserted that the need to compensate the injured plaintiff is not relevant to the issue of punitive damages in libel since an award of general damages compensates for any possible pecuniary and intangible harm. Thus the argument would be that the strong speech and press interest in publishing material on public issues, which we have recognized as parallel to the interest in publishing political criticism present in *New York Times,* must be served by a limitation on punitive damages restricting them to cases of "actual malice" as defined in *New York Times* and *Garrison* v. *Louisiana, supra.* We find the force of any such argument quite insufficient to overcome the compelling contrary considerations, and there is, moreover, nothing in any of our past cases which suggests that compensatory and punitive damages are subject to different constitutional standards of misconduct.

Where a publisher's departure from standards of press responsibility is severe enough to strip from him the constitutional protection our decision acknowledges, we think it entirely proper for the State to act not only for the protection of the individual injured but to safeguard all those similarly situated against like abuse. Moreover, punitive damages require a finding of "ill will" under general libel law and it is not unjust that a publisher be forced to pay for the "venting of his spleen" in a manner which does not meet even the minimum standards required for constitutional protection. Especially in those cases where circumstances outside the publication itself reduce its impact sufficiently to make a compensatory imposition an inordinately light burden, punitive damages serve a wholly legitimate purpose in the protection of individual reputation. We would hold, therefore, that misconduct sufficient to justify the award of compensatory damages also justifies the imposition of a punitive award, subject of course to the limitation that such award is not demonstrated to be founded on the mere prejudice of the jury. As we have already noted (*supra,* pp. 156–158) the case on punitive damages was put to the jury under instructions which satisfied the constitutional test we would apply in cases of this kind, and the evidence amply supported the jury's findings.[23]

The judgment of the Court of Appeals for the Fifth Circuit in No. 37 is affirmed. The judgment of the

---

[23] It should also be noted that prior to publication the Saturday Evening Post had been notified both by Butts and his daughter that the material about to be printed was false. Despite these warnings, and the fact that no member of the staff had ever even seen Burnett's crucial notes, no further efforts at investigation were undertaken prior to publication. It might indeed be argued that this conduct would have sufficed, under proper instructions, to satisfy even the "actual malice" standard of *New York Times,* the notice to the Saturday Evening Post being considered as furnishing the necessary "mental element." *New York Times, supra,* at 287.

Texas Court of Civil Appeals in No. 150 is reversed and the case is remanded to that court for further proceedings not inconsistent with the opinions that have been filed herein by THE CHIEF JUSTICE, MR. JUSTICE BLACK, and MR. JUSTICE BRENNAN.

*It is so ordered.*

MR. CHIEF JUSTICE WARREN, concurring in the result.

While I agree with the results announced by MR. JUSTICE HARLAN in both of these cases, I find myself in disagreement with his stated reasons for reaching those results. Our difference stems from his departure from the teaching of *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), to which we both subscribed only three years ago.

I.

In the *New York Times* case, we held that a State cannot, consistently with the First and Fourteenth Amendments, award damages to a "public official" for a defamatory falsehood relating to his official conduct unless the verdict is based on proof of "actual malice"— that is, proof that the defamatory statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U. S., at 280. The present cases involve not "public officials," but "public figures" whose views and actions with respect to public issues and events are often of as much concern to the citizen as the attitudes and behavior of "public officials" with respect to the same issues and events.

All of us agree that the basic considerations underlying the First Amendment require that some limitations be placed on the application of state libel laws to "public figures" as well as "public officials." Similarly, the seven members of the Court who deem it necessary to pass upon the question agree that the respondents in these cases are "public figures" for First Amendment purposes.

Having reached this point, however, MR. JUSTICE
HARLAN's opinion departs from the standard of *New
York Times* and substitutes in cases involving "public
figures" a standard that is based on "highly unreasonable
conduct" and is phrased in terms of "extreme depar-
ture from the standards of investigation and reporting
ordinarily adhered to by responsible publishers" (*ante,*
p. 155). I cannot believe that a standard which is based
on such an unusual and uncertain formulation could
either guide a jury of laymen or afford the protection
for speech and debate that is fundamental to our society
and guaranteed by the First Amendment.

To me, differentiation between "public figures" and
"public officials" and adoption of separate standards of
proof for each have no basis in law, logic, or First Amend-
ment policy. Increasingly in this country, the distinc-
tions between governmental and private sectors are
blurred. Since the depression of the 1930's and World
War II there has been a rapid fusion of economic and
political power, a merging of science, industry, and gov-
ernment, and a high degree of interaction between the
intellectual, governmental, and business worlds. Depres-
sion, war, international tensions, national and interna-
tional markets, and the surging growth of science and
technology have precipitated national and international
problems that demand national and international solu-
tions. While these trends and events have occasioned a
consolidation of governmental power, power has also be-
come much more organized in what we have commonly
considered to be the private sector. In many situations,
policy determinations which traditionally were channeled
through formal political institutions are now originated
and implemented through a complex array of boards,
committees, commissions, corporations, and associations,
some only loosely connected with the Government. This
blending of positions and power has also occurred in

the case of individuals so that many who do not hold public office at the moment are nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large.

Viewed in this context, then, it is plain that although they are not subject to the restraints of the political process, "public figures," like "public officials," often play an influential role in ordering society. And surely as a class these "public figures" have as ready access as "public officials" to mass media of communication, both to influence policy and to counter criticism of their views and activities. Our citizenry has a legitimate and substantial interest in the conduct of such persons, and freedom of the press to engage in uninhibited debate about their involvement in public issues and events is as crucial as it is in the case of "public officials." The fact that they are not amenable to the restraints of the political process only underscores the legitimate and substantial nature of the interest, since it means that public opinion may be the only instrument by which society can attempt to influence their conduct.

I therefore adhere to the *New York Times* standard in the case of "public figures" as well as "public officials." It is a manageable standard, readily stated and understood, which also balances to a proper degree the legitimate interests traditionally protected by the law of defamation. Its definition of "actual malice" is not so restrictive that recovery is limited to situations where there is "knowing falsehood" on the part of the publisher of false and defamatory matter. "Reckless disregard" for the truth or falsity, measured by the conduct of the publisher, will also expose him to liability for publishing false material which is injurious to reputation. More significantly, however, the *New York Times* standard is an important safeguard for the rights of the

press and public to inform and be informed on matters of legitimate interest. Evenly applied to cases involving "public men"—whether they be "public officials" or "public figures"—it will afford the necessary insulation for the fundamental interests which the First Amendment was designed to protect.

## II.

I have no difficulty in concluding that No. 150, *Associated Press* v. *Walker,* must be reversed since it is in clear conflict with *New York Times.* The constitutional defenses were properly raised and preserved by the petitioner. The trial judge expressly ruled that no showing of malice in any sense had been made, and he reversed an award of punitive damages for that reason. The seven members of this Court who reach the question agree with that conclusion, and all agree that the courts below erred in holding the First Amendment inapplicable. Under any reasoning, General Walker was a public man in whose public conduct society and the press had a legitimate and substantial interest.

## III.

But No. 37, *Curtis Publishing Co.* v. *Butts,* presents an entirely different situation. There, no First Amendment defenses were raised by the petitioner until after the trial. Because of this failure and because the case was tried before our decision in *New York Times,* the trial judge did not instruct the jury in terms of the precise formulation we adopted. In connection with the issue of punitive damages, however, the trial judge did give an "actual malice" instruction which invoked the elements we later held necessary in *New York Times.* He instructed the jury that it would have to find "actual malice" before awarding punitive damages, and he continued by defining "actual malice" as denoting "wanton or reckless indifference or culpable negligence with re-

gard to the rights of others" and as including notions of "ill will, spite, hatred and an intent to injure one." Under the Georgia law of defamation which governed the case, the jury was also specifically required to find that the defamatory statements were false before it could award any damages, and it was so instructed. With the jury's attention thus focused on this threshold requirement of falsity, the references in the instructions to wanton or reckless indifference and *culpable* negligence most probably resulted in a verdict based on the requirement of reckless disregard for the truth of which we spoke in *New York Times*.[1] Although the "actual malice" instructions were not also given in connection with the compensatory damage issue, it is difficult to conceive how petitioner could have been prejudiced by that failure in view of the fact that the jury, guided by "actual malice" instructions, awarded $3,000,000 in punitive damages.[2]

Unquestionably, in cases tried after our decision in *New York Times* we should require strict compliance with the standard we established. We should not, how-

---

[1] We held unconstitutional in *Garrison* v. *Louisiana*, 379 U. S. 64 (1964), a criminal defamation statute which authorized conviction on proof that a defamatory statement had been motivated by ill will. The statute did not require that the defamatory statement be false to sustain such a conviction.

[2] In the *New York Times* case, "actual malice" instructions were given in connection with punitive damages. However, we noted:

"While Alabama law apparently requires proof of actual malice for an award of punitive damages, where general damages are concerned malice is 'presumed'. Such a presumption is inconsistent with the federal rule. . . . Since the trial judge did not instruct the jury to differentiate between general and punitive damages, it may be that the verdict was wholly an award of one or the other. But it is impossible to know, in view of the general verdict returned. *Because of this uncertainty,* the judgment must be reversed and the case remanded." 376 U. S., at 283–284. (Emphasis added.)

The jury in the present case was required to separate compensatory and punitive damages.

ever, be so inflexible in judging cases tried prior thereto, especially when, as here, the trial judge—unaided by advice or objections from counsel—recognized the essential principle and conformed with it to a substantial degree. Moreover, after the *New York Times* rule was brought to the trial judge's attention in a post-trial motion, he reviewed the record in light of that precise standard and held that the jury verdict should not be disturbed since "there was ample evidence from which a jury could have concluded that there was reckless disregard by the [petitioner] of whether the article was false or not."

An additional factor leads me to the conclusion that we should not insist on the financial and emotional expenses of a retrial here merely because the trial judge's instructions were not given in the precise terms of the present constitutional standard.[3] That factor, to which I briefly adverted above, was the choice of the petitioner in this case to raise only truth as a defense and to omit in its pleadings and at the trial any reference to possible First Amendment defenses or even to the conditional privilege provided by Georgia law for "[c]omments upon the acts of public men in their public capacity and with reference thereto."[4] I use the word "choice" in this

---

[3] Cf. *Time, Inc.* v. *Hill,* 385 U. S. 374, 411 (1967) (dissenting opinion of MR. JUSTICE FORTAS).

[4] Ga. Code Ann. § 105–709 (6) provides:

"Privileged communications.—The following are deemed privileged communications:

.  .  .  .  .

"6. Comments upon the acts of public men in their public capacity and with reference thereto."

This privilege is qualified by Ga. Code Ann. § 105–710, which provides:

"Malicious use of privilege.—In every case of privileged communications, if the privilege is used merely as a cloak for venting private malice, and not bona fide in promotion of the object for which the privilege is granted, the party defamed shall have a right of action."

connection, because the facts lead me, as they did the Court of Appeals, to the firm conclusion that the omissions were deliberate. Although this trial occurred before our decision in *New York Times,* we had granted certiorari to review that case even before the complaint here was filed.[5] The Alabama law firm which had represented the New York Times in the state courts was involved in the trial of this case. Lead counsel in the cases conferred periodically, and one of the members of the Alabama law firm referred to above sat at the counsel table throughout this trial. The same Alabama law firm was retained to represent petitioner in a lawsuit filed by Coach Paul Bryant, who was also libeled by the magazine article here in question. First Amendment defenses were raised both at the trial of the *New York Times* case and by the pleadings in the Bryant lawsuit which was settled for a substantial sum of money. But counsel did not raise such defenses here. Given the importance of this case to petitioner and the interplay between overlapping counsel aligned on the same sides of related lawsuits, I can only conclude that tactical or public relations considerations explain the failure here to defend on First Amendment grounds.

## IV.

Satisfied, as I am, that under the circumstances of the *Butts* case no retrial should be ordered merely because of the instructions, I turn now to the final duty which this Court has when violations of fundamental constitu-

---

[5] Certiorari was granted in *New York Times Co.* v. *Sullivan* on January 7, 1963. 371 U. S. 946. The complaint in this case was filed approximately 2½ months later, on March 25, 1963. Counsel here could not have anticipated the precise standard we announced in *New York Times.* In the Bryant lawsuit and, of course, in the *New York Times* case itself, counsel did, however, raise general First Amendment defenses. No reference whatever to the First Amendment was made by defense counsel in the trial of this case.

tional principles are alleged. We must review the evidence to ascertain whether the judgment can stand consistently with those principles. *New York Times Co. v. Sullivan,* 376 U. S. 254, 285 (1964); *Speiser v. Randall,* 357 U. S. 513, 525 (1958).

The petitioner in this case is a major factor in the publishing business. Among its publications is the Saturday Evening Post which published the defamatory falsehoods here in question. Apparently because of declining advertising revenues, an editorial decision was made to "change the image" of the Saturday Evening Post with the hope that circulation and advertising revenues would thereby be increased. The starting point for this change of image was an announcement that the magazine would embark upon a program of "sophisticated muckraking," [6] designed to "provoke people, make them mad."

Shortly thereafter, and as an apparent implementation of the new policy, the Saturday Evening Post purchased the rights to the article which formed the subject matter of this case. The slipshod and sketchy investigatory techniques employed to check the veracity of the source and the inferences to be drawn from the few facts believed to be true are detailed at length in the opinion of MR. JUSTICE HARLAN. Suffice it to say that little investigative effort was expended initially, and no additional inquiries were made even after the editors were notified by respondent and his daughter that the account

---

[6] Webster's New International Dictionary (2d ed., unabr.), p. 1606, reports the source of the term "muckrake" as follows:

"On April 14, 1906, President Roosevelt delivered a speech in which he used the term *muckrake* in attacking the practice of making sweeping and unjust charges of corruption against public men and corporations . . . ."

Roget's International Thesaurus § 934 (3) lists the following as synonyms: muckrake, throw mud at, throw or fling dirt at, drag through the mud and bespatter.

to be published was absolutely untrue. Instead, the Saturday Evening Post proceeded on its reckless course with full knowledge of the harm that would likely result from publication of the article. This knowledge was signaled by the statements at the conclusion of the article that "Wally Butts will never help any football team again" and "careers will be ruined, that is sure."

I am satisfied that the evidence here discloses that degree of reckless disregard for the truth of which we spoke in *New York Times* and *Garrison*. Freedom of the press under the First Amendment does not include absolute license to destroy lives or careers.

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins, concurring in the result in No. 150, and dissenting in No. 37.

I concur in reversal of the judgment in No. 150, *Associated Press* v. *Walker,* based on the grounds and reasons stated in Parts I and II of THE CHIEF JUSTICE's opinion. I do this, however, as in *Time, Inc.* v. *Hill,* 385 U. S. 374, 398, "in order for the Court to be able at this time to agree on [a disposition of] this important case based on the prevailing constitutional doctrine expressed in *New York Times Co.* v. *Sullivan,* 376 U. S. 254. [THE CHIEF JUSTICE's] . . . opinion [would decide] the case in accordance with this doctrine, to which the majority adhere. In agreeing to . . . [that] opinion, I do not recede from any of the views I have previously expressed about the much wider press and speech freedoms I think the First and Fourteenth Amendments were designed to grant to the people of the Nation. See, *e. g., New York Times Co.* v. *Sullivan,* 376 U. S., at 293 (concurring opinion); *Rosenblatt* v. *Baer,* 383 U. S. 75, 94 (concurring and dissenting opinion)."

I would reverse the judgment in No. 37 for the reasons given in my concurring opinion in *New York Times Co.* v.

*Sullivan,* 376 U. S. 254, 293, and my concurring and dissenting opinion in *Rosenblatt* v. *Baer,* 383 U. S. 75, 94, but wish to add a few words.

These cases illustrate, I think, the accuracy of my prior predictions that the *New York Times* constitutional rule concerning libel is wholly inadequate to save the press from being destroyed by libel judgments. Here the Court reverses the case of *Associated Press* v. *Walker,* but affirms the judgment of *Curtis Publishing Co.* v. *Butts.* The main reason for this quite contradictory action, so far as I can determine, is that the Court looks at the facts in both cases as though it were a jury and reaches the conclusion that the Saturday Evening Post, in writing about Butts, was so abusive that its article is more of a libel at the constitutional level than is the one by the Associated Press. That seems a strange way to erect a constitutional standard for libel cases. If this precedent is followed, it means that we must in all libel cases hereafter weigh the facts and hold that all papers and magazines guilty of gross writing or reporting are constitutionally liable, while they are not if the quality of the reporting is approved by a majority of us. In the final analysis, what we do in these circumstances is to review the factual questions in cases decided by juries— a review which is a flat violation of the Seventh Amendment.

It strikes me that the Court is getting itself in the same quagmire in the field of libel in which it is now helplessly struggling in the field of obscenity. No one, including this Court, can know what is and what is not constitutionally obscene or libelous under this Court's rulings. Today the Court will not give the First Amendment its natural and obvious meaning by holding that a law which seriously menaces the very life of press freedom violates the First Amendment. In fact, the Court is suggesting various experimental expedients in libel cases,

all of which boil down to a determination of how offensive to this Court a particular libel judgment may be, either because of its immense size or because the Court does not like the way an alleged libelee was treated. Again I suggest (see *Time, Inc.* v. *Hill*, 385 U. S. 374, 399) that we are rapidly but surely getting ourselves in the dilemma we found ourselves in when we were compelled to overrule the ill-starred case of *Betts* v. *Brady*, 316 U. S. 455,* in order that the state courts of the country might be able to determine with some degree of certainty when an indigent person was entitled to the benefit of a lawyer and avoid the spawning of hundreds of habeas corpus cases that finally raised questions that a lawyer could and would have raised at the trial.

I think it is time for this Court to abandon *New York Times Co.* v. *Sullivan* and adopt the rule to the effect that the First Amendment was intended to leave the press free from the harassment of libel judgments.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE WHITE joins, concurring in the result in No. 150, and dissenting in No. 37.

I join Parts I and II of the opinion of THE CHIEF JUSTICE and the disposition in No. 150, *Associated Press* v. *Walker.*

In No. 37, *Curtis Publishing Co.* v. *Butts,* insofar as THE CHIEF JUSTICE's opinion demonstrates that the evidence unmistakably would support a judgment for Butts under the *New York Times* standard, I agree. I would, however, remand for a new trial since the charge to the jury did not comport with that standard.[1] The charge on compensatory damages directed that the jury find

---

*Gideon* v. *Wainwright*, 372 U. S. 335.

[1] For the reasons expressed in the opinion of MR. JUSTICE HARLAN I agree that petitioner did not waive his contentions under *New York Times.*

liability on a finding of mere falsehood. And the trial court stated that punitive damages might be awarded on a finding of "actual malice" which it defined to encompass "the notion of ill will, spite, hatred and an intent to injure one," and also to denote "a wanton or reckless indifference or culpable negligence with regard to the rights of others." The court detailed some factors the jury could consider in applying this standard. It said, for example, that "[a] publication may be so extravagant in its denunciation and so vituperative in its character as to justify an inference of malice," and that "proof that the plaintiff did demand a retraction but that the defendant failed to retract the article may be considered by you on the question of punitive damages." But "[d]ebate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth." *Garrison* v. *Louisiana,* 379 U. S. 64, 73. The "good motives" of the publisher can be no more relevant in the context of "public men" than in the context of criticism of "public officials." See *Garrison, supra.* The court added that the Post could show *in mitigation* of punitive damages that "it in good faith relied upon certain matters which had come to its attention." This makes crystal clear that the standard announced authorized the jury to award punitive damages even though it found that the Post had in good faith relied on matters which had come to its attention. The charge undoubtedly fails to comport with *New York Times.*[2]

---

[2] The statement by the trial court that "[m]alice also denotes a wanton or reckless indifference or culpable negligence with regard to the rights of others" could reasonably have been regarded by the jury to relate not to the truth or falsity of the matter, but to the

That the evidence might support a verdict under *New York Times* cannot justify our taking from the jury the function of determining, under proper instructions, whether the *New York Times* standard has been met. The extent of this Court's role in reviewing the facts, in a case such as this, is to ascertain whether there is evidence by which a jury could reasonably find liability under the constitutionally required instructions. See *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 284–292; *Time, Inc.* v. *Hill,* 385 U. S. 374, 391–394. When, as in this case, such evidence appears, the proper disposition in this federal case is to reverse and remand with direction for a new trial. See *Time, Inc.* v. *Hill, supra.*

---

Post's attitude toward Butts' reputation, akin to the spite and ill will in which terms the court had just defined "malice." See *Time, Inc.* v. *Hill,* 385 U. S. 374, 396, n. 12.