## AMOS v. FLORIDA PUBLISHING CO.
No. 64-240-L.

Circuit Court, Duval County.
September 1, 1964.

Cleveland & Goodfriend, Jacksonville, for plaintiff.

Harold B. Wahl of Loftin & Wahl, Jacksonville, for defendant.

W. A. STANLY, Circuit Judge.

*Summary judgment*: This cause came on to be heard, after due notice, upon defendant's motion for summary judgment. The voluminous affidavits, depositions and exhibits on file contain all material facts essential to disposition of the case, and as there is no dispute thereon it is an appropriate motion.

This is a suit for libel wherein plaintiff, as the sole owner of the stock of A & A Super Markets, Inc., complains of several news articles and an editorial published in September, 1963, by newspapers of the defendant, all dealing with a news release by the Florida state commissioner of agriculture, amplified by the supervisor of the school lunch program of Duval County public schools, charging plaintiff's corporation and its meat department with having furnished to certain Duval County public schools for use in their school cafeterias over 1,000 pounds of adulterated ground beef containing a sulphite preservative used to restore color and odor of freshness to such meat as may have been deteriorated for the purpose of disguising its unwholesome or decomposed status. All such contaminated meat was ordered destroyed by the state commissioner of agriculture pursuant to applicable law. Plaintiff admitted the act charged against him so that there is no question about the truth thereof.

News of the aforesaid incident originated with a written press release issued by the Florida state commissioner of agriculture in Tallahassee. There it was picked up by United Press International and Associated Press and dispatched over their press wire services to defendant's newspapers. Following receipt of the story from said sources, the defendant's newspapers, namely: the Florida Times-Union and the Jacksonville Journal, verified its factual accuracy with the supervisor of the Duval County school lunch program, and thereafter published and printed articles in one or both of its newspapers. Such publications contained words as follows —

"Tainted Meat Found in 6 Schools Here"

" . . . Ground beef containing a preservative used to disguise decomposed meat, was found in six lunchrooms."

"State To Act On Bad Meat"

"The bad meat was discovered before it was served to the children."

"Faces Hearing on Bad Meat"

"The so-called routine inspection paid off last week when the first delivery of ground beef arrived at six schools in the area. A laboratory analysis showed that sulphite had been used to color and deodorize decomposed meat. The supplier was A & A Super Markets, Inc., of Jacksonville Beach."

"There was a routine check that detected decomposed ground beef which school officials said had been doctored to pass it off as fresh meat."

Plaintiff alleges that such statements were libelous, and that he gave notice and opportunity to defendant to retract same as being false, malicious and unjustified but defendant failed to retract same, and further that he was severely damaged by reason thereof.

Defendant contends that subject articles were substantially accurate summarizations of the press release of the Florida state commissioner of agriculture, as amplified by the supervisor of Duval County school lunch program; and, in verification thereof, points out that each such official, upon being deposed by the plaintiff, emphatically stated that the respective news stories did accurately and properly report the facts involved and the meaning intended to be conveyed by their official statements on the subject.

It is a conceded fact that subject meat did contain the sulphite preservative in violation of law, and it is nowhere contradicted that its color "was not normal or natural" and had a "sour" and "unnatural odor for meat." It is also established that the only reason for using said additive is to restore color and odor of freshness to meat which may have deteriorated. Furthermore, it is established that the use of said additive precludes the possibility of a full and definite analysis through normal laboratory methods available to the commissioner to determine the specific degree of deterioration or decomposure of meat so contaminated. Plaintiff argues that since contamination renders it impossible to say exactly how bad or tainted the meat actually was it would be inaccurate, and libelous per se, to refer to it as "bad", "tainted" or "decomposed" meat. However ingenious the argument, plaintiff's admitted unlawful and reprehensible conduct should not afford the shield of protection he seeks. Its fallacious premise

nullifies that argument. Should the plaintiff be accorded a special advantage of claiming damages in a situation of this kind when it is his own misdeed that destroyed the evidence by which the party sued may have established a satisfactory defense? The doors of justice should not be opened to such trickery. It would seem more just that the plaintiff be left to sleep in the bed he made for himself.

Plaintiff also points out that the particular adjectives "bad", "tainted" or "decomposed" were not used in the press release to describe subject meat. Instead, such original release referred merely to "unwholesome", "decomposed" or "contaminated" meat. Plaintiff argues that this, and other minor variations between such original release and subject articles preclude defendant from reaching back to the original release as the lawful predicate for its publications. On this point, the commissioner who issued the release, explained his selection of language as follows—

"I used the word 'contaminated' which *includes* 'bad,' 'illegal', 'decomposed' or any other illegal and improper activity."

\*   \*   \*

"Q.  Now, you have carefully read the stories in the Jacksonville Journal and the Florida Times-Union quoting from said news releases, and which have been identified here, and are the statements attributed to you in said news stories accurate and do they or do they not correctly follow the news releases which you issued?

A.  They correctly follow the true meaning of the press releases. Different words were used at times which in my opinion mean the same thing."

Obviously the commissioner who composed the press release considered that the identical words used in the newspapers could have been just as properly chosen by himself to express the intent and true meaning of his press release. This court finds that subject articles reasonably and sufficiently meet the test of accuracy required of news publishers. But notwithstanding the alleged variation in meaning of the defamatory language used in reporting the unlawful conduct of plaintiff, it is incumbent in this case to consider the privilege accorded publications on matters of great public interest. It could not be successfully contended that the furnishing of adulterated and contaminated meat to huge numbers of public school children could escape being classified as a matter of great public interest.

As stated at 20 Fla. Jur. 597—"It is a well settled rule that the communication of matters affecting the general interest of the public, if made in good faith, is conditionally privileged."

The Florida Supreme Court in Abram v. Odham and Florida Publishing Company, 89 So. 2d 334, approved that rule in the following expressions—

> The defendant publishing company gave a fair and accurate account of the remarks made by the defendant Odham at a political rally, *in accordance with its qualified privilege* to publish matters of great public interest, Crowell-Collier Publ. Co. v. Caldwell, 170 F. 2d 941. There was no error, therefore, in the ruling of the trial judge that the defamatory remarks complained of were *qualifiedly privileged.*

> The rule relative to qualified privilege is, however, subject to the limitation that the parties must act without malice. "When a matter which otherwise would be a qualifiedly privileged communication is published *falsely, fraudulently and with express malice and intent* to injure the persons against whom it is directed, the communication loses its qualifiedly privileged character and the parties lay themselves liable to a suit for damages in an action of libel or slander." Loeb v. Geronemus (Fla. 1953), 66 So.2d 241, 244. The plaintiff's complaint contained the usual allegations of falsity and malice on the part of the defendants. So the question then becomes: Do the circumstances disclosed by the complaint negative the allegations of express malice made by complaint?

> It should first be noted that in cases of qualified privilege, "the presumption which attends cases not so privileged of malice from the publication of libelous language does not prevail, the burden of proof is changed, and in order for the plaintiff to recover *he is called upon affirmatively and expressly to show malice in the publisher.*" Coogler v. Rhodes, 38 Fla. 249 21 So. 109. If the uncontroverted facts are equally consistent with either the existence or non-existence of malice, *there can be no recovery,* for "there is nothing to rebut the presumption which has arisen in favor of the defendant from the privileged publication." Myers v. Hodges, 58 Fla. 197, 44 So. 357, 365. Evidence of malice may be either intrinsic, that is inferable from the very nature of the defamatory language itself, or extrinsic. Myers v. Hodges, supra, 44 So. 357. But while malice may be inferred from the nature of the communication itself, *it cannot be inferred from the mere fact that the statements are untrue.* Coogler v. Rhodes, supra, 21 So. 109.

> We think there can be no question but that the uncontroverted facts disclosed by the complaint negative any possibility of malice on the part of the defendant publishing company. (p. 336)

(Italics added here and elsewhere throughout this opinion added by the court, unless otherwise noted.)

See also Abraham v. Baldwin, 52 Fla. 151, 42 So. 591.

Restatement of the Law of Torts, volume 3, section 606, page 275 —

> (1) Criticism of so much of another's activities as are matters of public concern is privileged if the criticism, *although defamatory,*
>
>> (a) Is upon
>>> (i) a true or privileged statement of fact, or
>>> (ii) upon facts otherwise known or available to the recipient as a member of the public, and
>> (b) represents the actual opinion of the critics, and

(c) is not made solely for the purpose of causing harm to the other.

(2) Criticism of the private conduct or character of another who is engaged in activities of public concern, insofar as his private conduct or character affects his public conduct, is privileged, if the criticism, although defamatory, complies with the requirements of Clauses (a), (b) and (c) of Sub-section (1) and in addition, is one which a man of reasonable intelligence and judgment might make.

See also 20 Fla. Jur. 583, where it is said — "In the absence of malice, a publication may be qualifiedly privileged, *even though it is not true*, and notwithstanding the fact that it contains a charge of *crime*." And 20 Fla. Jur. 632, stating—"Thus, in the case of qualifiedly privileged communications, the presumption of malice from publication of libelous language does not prevail. To recover, *the plaintiff is called upon to show malice expressly and affirmatively in the publisher.*"

The above quoted rules of law are applicable here. Subject articles dealt with a matter of great public interest. The record in this case shows that all affected editors or reporters testified they had no malice, ill will, spite or bad feeling toward plaintiff. Neither they, nor plaintiff, knew each other, and plaintiff conceded that there was no personal ill will, spite, bad relations or friction prevailing between him and defendant. The news stories and editorial were handled as routine matters of public interest on a strictly impersonal and lawful basis. Under such prevailing circumstances, the plaintiff must show express malice on the part of defendant. In recognition of such requirement, the second count of his amended complaint undertook to allege such express malice. However, disclosure of the facts as reflected by the record in this case does not support that essential allegation. On the contrary, a careful review of the situation convinces this court that the articles were a fair and accurate summarization of statements made by officials on matters of great public interest published in good faith and without any malice toward plaintiff. Both counts of the amended complaint allege that the statements complained of were both false and unprivileged. From the above, it is obvious that such naked allegations are contrary to the facts revealed by the record in the case.

In consideration of the premises, it is, therefore, considered, ordered and adjudged that the pleadings, depositions and admissions on file show that there is no genuine issue as to any material fact and that defendant is entitled to summary judgment as a matter of law; that plaintiff take nothing by his suit and that defendant go hence without day; that defendant, Florida Publishing Company, do hereby have and recover of and from plaintiff, John A. Amos, doing business as A & A Super Markets, Inc., its costs to be taxed by the court on subsequent proceedings herein.