## WEST v. FLORIDA PUBLISHING CO., et al (No. 2).

No. 67-9280

Circuit Court, Duval County.

March 15, 1968.

Goldman, Presser & Lewis, Jacksonville, for plaintiff.

Harold B. Wahl of Loftin & Wahl, Jacksonville, for defendants.

**WILLIAM L. DURDEN, Circuit Judge.**

*Summary final judgment:* This cause is before the court on defendants' motion for a summary judgment.

Plaintiff West, a Caucasian and a member of the Duval County Civil Service Board, was a candidate running against Earl Johnson, a member of the Negro ethnic group, for a seat on the Jacksonville City Council.

One of the defendant's newspapers, the *Jacksonville Journal,* ran an editorial or article during the campaign, written by its political editor, the defendant Harmon, entitled — "We Don't Need Racism".

On the basis thereof this suit for libel was instituted against the editor and the publishing company.

In his amended complaint the plaintiff alleged that —

"defendants falsely and maliciously wrote, printed, published and circulated, or caused to be written, printed, published and circulated in 'The Jacksonville Journal', of and concerning the plaintiff, an article, copy of which was attached to the original complaint, and thereby incorporated herein, which said article and all and singular the statements contained therein were false, malicious, defamatory and libelous of the plaintiff in that said plaintiff was thereby exposed to the hatred, contempt, distrust, ridicule or obloquy of the public, or in that it tended to cause the plaintiff to be avoided. Said article was written, printed, published and circulated although the defendants had knowledge of the falsity of the matters stated therein, or acted in reckless disregard of whether said matters were true or not."

In count II of the amended complaint the plaintiff added the following allegations that —

"said article and all and singular the statements contained therein were false, malicious, defamatory and libelous of the plaintiff in that said plaintiff was thereby exposed to the hatred, contempt, distrust, ridicule or obloquy of the public, or that it tended to cause the plaintiff to be avoided.

"Said article was critical of the plaintiff in his capacity as a public figure, and not in his capacity as a public official, and was written, printed, published and circulated as the end result of conduct which was an extreme departure from ordinary standards of investigating and reporting."

3

The defendant denied the material allegations contained in the amended complaint and affirmatively alleged —

"that this is a privileged publication (where plaintiff must prove that the publication involved was published with actual and express malice within the Federal Constitutional rule as defined and laid down in New York Times v. Sullivan, 376 U.S. 254, Associated Press v. Walker, 388 U.S. 130, and following cases), and defendants specifically deny such actual and express malice."

Subsequent to the creation of these issues the deposition of the plaintiff has been taken at length and various affidavits have been filed by the plaintiff and the defendants in support of and against the defendants' motion for summary judgment.

The article by the defendant George Harmon, "Journal Political Editor," which is and does constitute the central core of the asserted cause of action, is set forth below —

## WE DON'T NEED RACISM

A vote for Earl Johnson in the second Democratic primary will show Roger West, Johnson's opponent, and others who feel inclined to preach race hatred in future political races here that Duval County has said goodby to the Dark Ages.

It is true that West has been somewhat subtle in his attempts to capitalize on the fact that he is white while Johnson is a Negro, but the true intent behind West's public statements and his advertisements is plain for everyone to see.

The time to speak out against racism is when it first rears its ugly head in such a gentle manner. If the German people had stopped Adolf Hitler in the early days of Nazism, it would not have cost six million Jews their lives, not to mention thousands of American GIs.

The failure of the South a century ago to make honest attempts to learn how two races can live like brothers is the reason we must spend much time and money fighting hatred today instead of devoting our energy to legitimate social problems.

Racism, and our failure to bury it in past years, was the ultimate root of the tragedies that, in recent years, have visited Watts, Newark and Detroit.

Racism could trigger the same violence in Jacksonville at some time in the future unless our consolidated government is run by enlightened men.

## LAW, MORALITY, REASON

Is Earl Johnson less than a man because he is a Negro?

Legally, no, says the U.S. Supreme Court. Morally, no, say the leaders of every major religious denomination in our land. Logically,

no, says every respected scientist who has attempted to probe the physical causes of racial differences.

Hatred therefore violates law, morality and reason.

West, in the time-honored tradition of hate, has unveiled his true intentions by gradual steps.

He told me, one day before last Tuesday's election, that his race for the Group 5 City Council seat would be a battle between "conservative (his) and liberal (Johnson's) philosophies."

West struck out on this point when Johnson ran ads which listed conservative white business leaders among his supporters.

Then, on the night of the second primary, West suggested to *Journal* reporter Thatcher Walt that Earl Johnson be asked how he feels about busing children to schools.

This was an obvious attempt to inject the question of school desegregation into the City Council race.

It happens to be a fact that the consolidated City Council won't have the slightest power to speed up, slow down or stagnate desegregation.

The federal courts long ago stated that a Negro child in Duval County can enroll in any predominantly white school he desires and, in fact, many have done so.

Earl Johnson can hardly influence the courts to do more than it has already done, and Roger West most certainly can't make the courts backtrack.

## CHECK THE WHITE VOTES

West's latest attempts to hurt Earl Johnson make no attempt to be subtle. The ads refer to the fact that Johnson did better in Negro precincts than six white opponents in last Tuesday's balloting.

The implication is that all good white men will "vote white" because the Negroes are voting along racial lines.

What West's ads fail to mention is that Earl Johnson did right well in the county's all-white precincts, too.

Johnson was a runaway winner in Precinct 32-O, which is all white; led the seven man ticket in 32-D, which is all white; 32-H, which is all white; 32-M, which is all white; swamped all opponents in 32-P, which is all white; and 32-Q, which is all white; 28-A, which is all white; 28-B, which is all white; 28-D, which is all white; 28-G, which is all white; 28-H, which is all white; 32-C, which is all white; 32-I, which is all white; 29-A, which is all white; 29-E, which is all white; 29-H, which is all white; 29-J, which is all white; 6-E, which is all white; 6-F, which is all white; 6-G, which is all white; 9-A, which is all white; 9-E, which is all white; won 26-G, which is all white; 6-H, which is all white; 6-I, which is all white; 6-J, which is all white; 8-B, which is all white; 8-C, which is all white; 8-D, which is all white; 8-E, which is all white; 25-C, which is all white; 25-D,

which is all white; 25-I, which is all white; 27-A, which is all white; 27-B, which is all white; 27-C, which is all white; and 26-A, which is all white.

In brief, out of 65 totally white precincts in Duval County, Johnson outdid six white candidates in 37 precincts and tied West for the lead in one.

Clearly, the first primary vote was far from being what West is calling it — a contest of Negro versus white.

It seems to me that the moral level of Jacksonville is much higher than Roger West believes it to be.

The Supreme Court of the United States, beginning with New York Times v. Sullivan (1964) 376 U.S. 254, 11 L.Ed.2d 686, 95 A.L.R.2d 1412, 1450, 1455, has held that for a public officer to recover damages for an alleged libelous publication, he must "prove that the publication involved was deliberately falsified or published recklessly despite the publisher's awareness of probable falsity". The Supreme Court of the United States there set up a federal constitutional law of libel which pre-empts the field and supersedes all state law, constitutional, statutory, or judicial, to the contrary.

The *Sullivan* case was followed by other cases, notably Garrison v. Louisiana (1964) 379 U.S. 64, 13 L.Ed.2d 125, 133-135; Rosenblatt v. Baer (1966) 383 U.S. 75, 5 L.Ed.2d 597; Associated Press v. Walker (1967) 388 U.S. 130, 18 L.Ed.2d 1094; Time v. Hill (1967) 385 U.S.254, 17 L.Ed.2d 456, 467; and Beckley Newspapers Corp. v. Hanks (1967) 19 L.Ed.2d 248, which have extended the doctrine to not only those who hold public office but to candidates for public office and public figures.

As stated in Time v. Hill, 17 L.Ed.2d at page 467 —

We hold that the constitutional protections for speech and press preclude the application of the New York statute to redress false reports of matters of public interest in the absence of proof that the defendant published the report with knowledge of its falsity or in reckless disregard of the truth.

In *Sullivan*, 11 L.Ed.2d at page 696, the Supreme Court held that the Alabama Court was in error in imputing express malice when the Alabama Court said —

. . . that malice could be inferred from the Times' "irresponsibility" in printing the advertisement while "the Times in its own files had articles already published which would have demonstrated the falsity of the allegations in the advertisement"; from the Times' failure to retract for respondent while retracting for the Governor, whereas the falsity of some of the allegations was then known to the Times and "the matter contained in the advertisement was equally false as to

6

both parties"; and from the testimony of the Times' secretary that, apart from the statement that the dining hall was padlocked, he thought the two paragraphs were "substantially correct".

## The Supreme Court reversed, and said at page 697 —

We hold that the rule of law applied by the Alabama courts is constitutionally deficient for failure to provide safeguards for freedom of speech and of the press that are required by the First and Fourteenth Amendments in a libel motion brought by a public official against critics of his official conduct. We further hold that under the proper safeguards, the evidence presented in this case is constitutionally insufficient to support the judgment for respondent.

## And, as said in *Associated Press* at 18 L.Ed.2d 1110 —

That is to say, such officials were permitted to recover in libel only when they could prove that the publication involved was deliberately falsified, or published recklessly despite the publisher's awareness of probable falsity . . .

Investigatory failures alone were held insufficient to satisfy this standard.

## In the *Garrison* case, supra, the court extended the doctrine to criminal libel and to private reputation as well as public reputation, and found (13 L.Ed.2d 134, 135) —

The New York Times rule is not rendered inapplicable merely because an official's private reputation, as well as his public reputation, is harmed. The public-official rule protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, anything which might touch on an official's fitness for office is relevant. Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character. As the Kansas Supreme Court said in Coleman v. MacLennan, speaking of candidates —

"Manifestly a candidate must surrender to public scrutiny and discussion so much of his private character as affects his fitness for office, and the liberal rule requires no more. But in measuring the extent of a candidate's profert of character, it should always be remembered that the people have good authority for believing that grapes do not grow on thorns nor figs on thistles."

## See also News-Journal Company v. Gallagher (Dela. 1967) 233 Atl. 2d 166, where the Delaware Supreme Court reversed the lower court for not entering summary judgment for the newspaper and said —

After the case came to this Court, the opinion of the Supreme Court of the United States in Associated Press v. Walker, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094, was published. It holds that the New York Times rule is applicable, as a constitutional matter, to newspaper publications concerning "public figures" as well as "public

officials". We are, of course, bound by that decision. If Mr. Gallagher was either a public official or a public figure, he may not recover in this case in the absence of evidence that the statements complained of were false *and* were published with knowledge of the falsity or with a reckless disregard of whether they were false or true. Even if false statements are uttered as a result of mere negligence, the action will not lie.

There is no question but that the instant case is controlled by the so-called *Sullivan* rule. Plaintiff was and is a public figure and public official, and was at the time of the editorial a candidate for further public office.

This court is not unfamiliar with the *Sullivan* rule. When plaintiff's original complaint was before the court, the court in its order of December 20, 1967, reported at 29 Fla. Supp. 192, followed the above authorities and held —

"These authorities, together with the others which have been considered seem to say that where it is apparent from the papers filed with the complaint or from the language of the complaint itself that the plaintiff is a public official or a public figure, it then becomes his duty to allege facts sufficient to comply with the language quoted from the *Associated Press* case. As is stated in that case such officials may recover *only* when '*they could prove* that the publication involved was deliberately falsified or published recklessly despite the publisher's awareness of probable falsity'. Because this case says that it is the duty of the plaintiff to prove it, it therefore necessarily follows, as the night must the day, that it is his duty to allege it."

Furthermore, this court sat on, and authored the opinion of, the Supreme Court of Florida in the case of First-america Development Corporation v. Daytona Beach News-Journal (1967) 196 So.2d 97, 15 A.L.R.3rd 1238. While the question there primarily dealt with venue, the court had the occasion to go into the so-called *Sullivan* rule. A unanimous court held at 196 So.2d, pages 98, 99, 100 —

Long before this suit was filed this court had dedicated itself to the preservation of a free press. In Ross v. Gore (Fla. 1950) 48 So.2d 412, 415, we said —

"Since the preservation of our American democracy depends upon the public's receiving information speedily *** it is vital that no unreasonable restraints be placed upon the working news reporter or the editorial writer.

* * * * *

"The free press has long taken the position that government and public officials are 'fair game', and the courts have, with almost complete unanimity, supported that view. See series of

annotations entitled *'The Supreme Court and the right of free speech and press'* reported in 93 L.Ed. 1151, 2 L.Ed.2d 1706, and 11 L.Ed.2d 1116."

The freedom of the press to support or oppose, praise or condemn, attack or defend institutions other than government, such as religion, education, the arts, medicine, law, the family, slavery and women's suffrage, to name just a few, is well established.

The following language from the Sullivan case at 376 U.S. 254, 270, 11 L.Ed.2d 686, 700, 701, 702, is particularly applicable here, since what we have is criticism of a candidate's political philosophy and expressions —

The general proposition *that freedom of expression upon public questions is secured by the First Amendment* has long been settled by our decisions. The constitutional safeguard, we have said, "was fashioned to assure *unfettered interchange of ideas* for the bringing about of political and social changes desired by the people".

\* \* \* \* \*

Thus we consider this case against the background of a profound national commitment to the principle that *debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.*

\* \* \* \* \*

The present *advertisement*, as an expression of grievance and protest on one of the major public issues of our time, would seem clearly to qualify for the constitutional protection. The question is whether it forfeits that protection by the falsity of some of its factual statements and by its alleged defamation of respondent.

Authoritative interpretations of the First Amendment guarantees have consistently *refused to recognize an exception for any test of truth — whether administered by judges, juries, or administrative officials — and especially one that puts the burden of proving truth on the speaker.* Cf. Speiser v. Randall, 357 U.S. 513, 525, 526, 2 L.Ed.2d 1460, 1472, 78 S. Ct. 1332. The *constitutional protection does not turn upon "the truth,* popularity, or social utility of the ideas and beliefs which are offered." NAACP v. Button, 371 U.S. 415, 445, 9 L.Ed.2d 405, 425, 83 S.Ct. 328. As Madison said, "Some degree of abuse is inseparable from the proper use of everything; and in no instance is this more true than in that of the press." 4 Elliot's Debates on the Federal Constitution (1876), p. 571. In Cantwell v. Connecticut, 310 U.S. 296, 310, 84 L.Ed. 1213, 1221, 60 S.Ct. 900, 128 A.L.R. 1352, the Court declared:

"In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, *resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement.* But the people of this nation have ordained in the light of history,

that, *in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion* and right conduct on the part of the citizens of a democracy."

That *erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the* "breathing space" that they "need . . . to survive", NAACP v. Button, 371 U.S. 415, 433, 9 L.Ed.2d 405, 418, 83 S.Ct. 328, was also recognized by the Court of Appeals for the District of Columbia Circuit in Sweeney v. Patterson, 76 App.DC 23, 24, 128 F.2d 457, 458 (1942), cert. denied, 317 U.S. 678. Judge Edgerton spoke for a unanimous court which affirmed the dismissal of a Congressman's libel suit based upon a newspaper article charging him with *anti-Semitism* in opposing a judicial appointment. He said —

> "Cases which impose liability for erroneous reports of the political conduct of officials reflect the obsolete doctrine that the governed must not criticize their governors . . . The interest of the public here outweighs the interest of appellant or any other individual. The protection of the public requires not merely discussion, but information. Political conduct and views which some respectable people approve, and others condemn, are constantly imputed to Congressmen. *Errors of fact, particularly in regard to a man's mental states and processes, are inevitable* . . . Whatever is added to the field of libel is taken from the field of free debate." (Italics added.)

Here, plaintiff West admitted on deposition that he ran political advertisements where he said, for example —

"I'm Roger West. Why does my opponent Johnson refuse to discuss the key issues in this campaign? Is it because he favors using buses to carry school children from one section of the city to another in order to force racial balance in every school? This idea is fostered by the Civil Rights Commission, the advisory committee to which my opponent belongs. Here is an example of how it works. Some of the children from Ortega, Arlington, Southside, San Jose, Lakeshore, Cedar Hills and other areas predominantly white would no longer go to the school in their neighborhood. Buses would carry them into Magnolia Gardens, Moncrief and Myrtle Avenue sections to attend school there. Children from predominantly negro areas would be carried by bus out into the predominantly white areas. Now this is not an issue of race. It is an issue of philosophy. I support the proposition that all children should go to the school nearest their home. I ask your serious consideration. Roger West thanks you."

Plaintiff further ran an advertisement in the defendant newspaper, from which we quote —

## IS THIS
# GOOD FAITH?

**THIS IS HOW THE VOTE CAME OUT OF THE NEGRO PRECINCTS:**

| BATES | COREY | DOUGLAS | HARRELL | JOHNSON | THOMPSON | WEST |
|-------|-------|---------|---------|---------|----------|------|
| 324   | 163   | 278     | 184     | 10,109  | 428      | 314  |

Did the Negro give the same consideration to white candidates that white voters gave to Negro candidate Johnson?

— OR —

Is this block vote an example of the philosophy, "What's mine is mine and what's yours is negotiable"?

THINK ABOUT IT. *SERIOUSLY CONSIDER ROGER WEST;*

a man of proven ability whose philosophy is in line with your own, a conservative for whom you can vote now and not regret it later.

Paid Political Adv. by ROGER WEST

Defendants filed an affidavit from Jacksonville City Commissioner Burroughs that plaintiff asked Burroughs to "spread the word in the silk stocking areas . . . that Johnson favored busing colored students to white schools in that area". Plaintiff filed an affidavit in answer, but did not deny this portion of Burroughs' affidavit.

On his deposition, plaintiff admitted the following statement in the complained-of article was true —

"Then, on the night of the second primary, West suggested to Journal reporter Thatcher Walt that Earl Johnson be asked how he feels about busing children to schools."

In opposition to the motion for summary judgment the plaintiff filed an affidavit in which he said —

"The statements made by George Harmon in the editorial which is the subject of this suit, and any other comments impugning me as a racist or asserting that I injected racial issues into the campaign are fallacious and the result of irresponsible conclusions drawn from my discussions of what I believed were some of the issues in the campaign. Those involved my political conservatism and what I thought the opposing views of my opponent to be. No attempt was made to buttress those irresponsible conclusions by asking me what I meant when I discussed the 'good faith' of negro voters and the 'busing' question; rather, the defendants in this case chose to rely on their own unenlightened opinion of what I

said, and then infect their own news stories and the editorial in question with those virulent opinions.

* * * * *

"The issues which I intended to raise by discussing the 'busing' question and by running the 'good faith' advertisement (Exhibit A of my deposition) are stated at various points throughout my deposition. Prior to the publication of the article which is the subject of this suit and before the institution of this action neither of the defendants cared to inquire into my true motives; their rightful concern is tardy."

The defendants contend that in the context of the campaign and its issues, its reporters and editors were justified in their conclusions from the admitted facts (including the campaign advertisements) that West was injecting racial issues into the campaign.

As stated in *Sullivan* at 11 L.Ed.2d 702 —

> Political conduct and views which some responsible people approve, and others condemn, are constantly imputed to Congressmen. Errors of fact, particularly in regard to a man's mental state and processes, are inevitable . . . Whatever is added to the field of libel is taken from the field of free debate.

> Injury to official reputation affords no more warrant for repressing speech that otherwise would be free than does factual error.

In the recent case of Reaves v. Foster (Miss. 1967) 200 So.2d 453, the Supreme Court of Mississippi reversed judgment for plaintiff and said —

> Comments about school principal that he was an Uncle Tom, against his own race, stooge, informer, and less than a man were fair comment in matter concerning large sector of county's population in handling matter connected with government. (Hn.2)

> Hatred, ill will, enmity, intent to harm or negligence are insufficient to establish malice toward those involved in discussions on public issues. U.S.C.A., Const. Amends. 1, 14. (Hn.7)

See also Dyer v. Davis (La. 1966) 189 So.2d 678, where the Court of Appeal reversed a judgment for plaintiff, entered up judgment for defendant, and said —

> Article asserting that candidate for office of insurance commissioner was a dud, an ignorant man who let the public think he was a lawyer while not being versed in elemental insurance law of the state, that the candidate was an amateur, and that his pre-election promises pledged him to do what he could not do constituted comment and criticism of candidate's personal integrity and professional skill as defendant believed them to be revealed by candidate's campaign

promises and did not entitle candidate to recover for libel in absence of showing of actual malice. (Hn.9)

In Klaher v. Winterbell, et al., (Ariz. 1966), the syllabus at 418 Pac. 2d 404, reads —

> Libel action by university student senator against student editor and faculty advisor of publication on basis of an editorial. The Superior Court of Pima County, Case No. 81167, John P. Collins, Jr., entered summary judgment against plaintiff, and appeal was taken. The Court of Appeals, Molloy, Jr., held that caustic criticism and biting ridicule exemplified by university publication editorial stating inter alia that plaintiff was campus demagogue and was hissing in another pit, that he attempted to hamstring the publication, that Stalin, Hitler, and Mussolini first killed the free press, that maybe all plaintiff needed was a bigger "Mechano Set", and that he was a troublemaker and fanatic, were within bounds of freedom of criticism of "public officials".
>
> Affirmed.

All of the above cases cited and followed the *Sullivan* line of decisions.

The Circuit Court of Duval Country, Florida, has had before it numerous other cases where either motion to dismiss or motion for summary judgment was granted on the same basis of the absence of the actual *malice* contemplated by the *Sullivan* rule. See Abram v. Odham and Florida Publishing Company, 6 Fla. Supp. 102, affirmed by the Florida Supreme Court (1956) at 89 So.2d 334; Amos v. Florida Publishing Company (1964) 23 Fla. Supp. 169; Barrow v. Florida Publishing Company (1965), affirmed per curiam by Florida District Court of Appeal, First District, at 178 So.2d 628, certiorari dismissed by the Florida Supreme Court at 183 So.2d 215; Carroll v. Florida Publishing Company (1965) 25 Fla. Supp. 5; and Sullivan v. Florida Publishing Company (1966) 26 Fla. Supp. 51. Cf. Buckley v. Florida Publishing Company (C.A.-5, 1965) 338 F.2d 470.

It is clear from the foregoing discussion that in order for plaintiff public figure to recover here, negligence or failure of defendants to fathom plaintiff's mental processes, or failure of defendants to understand what he really meant by what he said, are insufficient to entitle him to recover. Plaintiff must prove "express malice" — in effect a deliberate and calculated lie with intent to harm.

Certainly nothing like that has been shown here. Defendants commented on the issues in a political campaign and plaintiff's stand thereon, as they understood it from what he admittedly said. Plaintiff is not entitled to recover under the federal constitutional law of libel, as exemplified by *Sullivan* and the other cases.

Thomas Jefferson said, as quoted by the Supreme Court of Florida in the *Firstamerica* case, supra, at 196 So.2d, page 101 —

"The basis of our government being the opinion of the people, the very first object should be to keep that right; and *were it left to me to decide whether we should have a government without newspapers or newspapers without a government, I should not hesitate a moment to prefer the latter.*" (Italics added.)

There is no cause of action for libel here by this public official, candidate, and public figure. It is obvious from the deposition of plaintiff and the affidavits that the article was on a matter of wide public interest in a primary election campaign. It was not "deliberately falsified". The publisher had no "awareness of probable falsity".

In consideration of the premises, it is therefore, ordered and adjudged that the pleadings, depositions and admissions on file show that there is no genuine issue as to any material fact and that defendants are entitled to summary judgment as a matter of law; that plaintiff take nothing by this suit, and that defendants go hence without day; that defendants Florida Publishing Company and George Harmon, do hereby have and recover of and from plaintiff, Roger West, their costs to be taxed by the court on subsequent proceedings herein.