## MERRITT-CHAPMAN & SCOTT CORPORATION v. ASSOCIATED PRESS, et al.

No. 69-17187.

Circuit Court, Dade County.

March 5, 1970.

Hugh S. Glickstein, Hollywood, and Hogan & Hartson, Washington, D. C., for the plaintiff.

George W. Wright, Miami, and Richard N. Winfield, New York City, for the defendant Associated Press.

Harold B. Wahl of Loftin & Wahl, Jacksonville, for the defendant Florida Publishing Co.

Dan H. S. Paul, Miami, for the defendant Miami Herald Publishing Co.

Paul A. Louis, Miami, for the defendant Miami Daily News, Inc.

GRADY L. CRAWFORD, Circuit Judge.

*Summary judgment for defendants:* This cause came on after due notice on defendants' motions for summary judgment.

Plaintiff Merritt-Chapman & Scott Corporation sues the defendants the Associated Press and the newspapers — Florida Publishing Company (the Florida Times-Union and Jacksonville Journal), Miami Herald Publishing Company and Miami Daily News, Inc. — for libel. The primary facts are undisputed, although extensive affidavits and depositions have been filed.

The Associated Press in January, 1969, sent out dispatches to its member newspapers telling of the criminal conviction and sentencing of plaintiff's officers and referring to plaintiff as "now bankrupt". Each of the defendant newspapers accepted this dispatch and published it without independent investigation as to its accuracy. In the *prior years,* each of the papers had run numerous stories about plaintiff and the criminal charges, convictions, and difficulties of Louis Wolfson, its principal officer and stockholder, and his associates in the management of the corporation. In some of these stories, reference had been made to the "liquidation" status at *that time* of the plaintiff. But the newspapers relied entirely on the Associated Press on this story sent out from New York City in January, 1969, referring to the *current* status of a Delaware corporation with its headquarters at 99 Park Avenue, New York City.

The defendant newspapers contend they are entitled to summary judgment on three grounds. First, that under the doctrine of Abram v. Odham and Florida Publishing Company (Fla. 1956) 89 So.2d 334, and Layne v. Tribune (Fla. 1933) 108 Fla. 177, 146 So. 234, the Florida newspapers had a right to rely on the Associated Press as to the current situation over 1,000 miles away (where they had no facilities of their own) and were not obligated "to assume the

burden of especially verifying" such dispatches; second, that under the so-called federal constitutional law of libel (New York Times v. Sullivan (1964) 376 U.S. 254, Associated Press v. Walker (1967) 388 U.S. 130, and following cases), plaintiff, in a case like this involving a story on a matter of public interest, has the burden of proving express malice with convincing clarity, i. e., that the story was a "calculated falsehood", whereas the undisputed facts show that the newspapers acted in good faith without any "express malice"; and third, that under the doctrine of Walsh v. Miami Herald (Fla. 1955) 80 So.2d 669, the story is to be interpreted "as the common mind would naturally understand it" and that plaintiff's condition where it was operating in the red and had ceased its normal operations was the equivalent of bankruptcy to the "common mind".

The court finds that under the undisputed facts each of the defendant newspapers is entitled to summary judgment. The *Layne* case, supra, held that the newspapers were entitled to rely on a newsgathering agency such as Associated Press or United Press International without making a check or independent investigation, as follows —

> "No newspaper could afford to warrant the absolute authenticity of every item of its news, nor assume in advance the burden of specially verifying every item of news reported to it by established news gathering agencies and continue to discharge with efficiency and promptness the demands of modern necessity for prompt publication, if publication is to be had at all."

In subsequent cases, summary judgments have been entered for the newspapers in cases where they relied on and printed dispatches from Associated Press. See MacGregor v. Miami Herald (Fla. DCA-2, 1960) 119 So.2d 85, affirming summary judgment entered by Palm Beach Circuit Court, and Walker v. Times Publishing Co. (C. C. Pinellas, 1965) 26 Fla. Supp. 90, 92, where summary judgment was entered for the defendant newspaper and not appealed. Moreover, in the *Abram* case, supra the Supreme Court upheld judgment entered for the defendant newspapers on the pleadings, despite an allegation of express malice, on the ground that the pleadings as a whole showed that the newspaper relied upon what a candidate for governor said, quoted him accurately, acted in good faith, and that it was "unthinkable that newspapers should not be allowed to give publicity to the matter without fear of being held to liability therefor in a libel suit". See also Carroll v. Florida Publishing Company (C. C. Duval, 1965) 25 Fla. Supp. 5, and Amos v. Florida Publishing Company (C. C. Duval, 1964)

23 Fla. Supp. 169, where summary judgments were entered on the same basis.

As stated in Ross v. Gore (Fla 1950) 48 So.2d 412, 415, long before New York Times —

> The public has an interest in the free dissemination of news. This interest was well stated by that great American, Thomas Jefferson, in the following words: "The only security of all is in a free press. The force of public opinion cannot be resisted, when permitted freely to be expressed. The agitation it produces must be submitted to. It is necessary to keep the waters pure. No government ought to be without censors; and where the press is free no one ever will." It is true that there are occasions when the freedom of the press is abused, just as some individuals abuse their right to speak and write their sentiments freely. But, in discussing this problem, Thomas Jefferson said: "Some degree of abuse is inseparable from the proper use of every thing; and in no instance is this more true than in that of the press." ***

> In the free dissemination of news, then, and fair comment thereon, hundreds and thousands of news items and articles are published daily and weekly in our newspapers and periodicals. This court judicially knows that it frequently takes a legal tribunal months of diligent searching to determine the facts of a controversial situation. When it is recalled that a reporter is expected to determine such facts in a matter of hours or minutes, it is only reasonable to expect that occasional errors will be made. Yet, since the preservation of our American democracy depends upon the public's receiving information speedily — particularly upon getting news of pending maters while there still is time for public opinion to form and be felt — it is vital that no unreasonable restraints be placed upon the working news reporter or the editorial writer.

The so-called *New York Times* doctrine is a further defense on which the news media are entitled to summary judgment. There is a good discussion of this doctrine in the case of West v. Florida Publishing Company (C. C. Duval, 1968) 30 Fla. Supp. 1, where the court entered up summary judgment for the newspaper and cited authorities holding that "plaintiff must prove express malice — in effect, *a deliberate and calculated lie with intent to harm*". Clearly, the *New York Times* doctrine applies to a situation such as that here, for not only was the plaintiff the alter ego of its principal officer and controlling stockholder, Louis Wolfson, who was very definitely a public figure, but the matter was one of wide public interest. See All Diet Foods v. Time (N. Y. 1968) 290 N.Y.S. 2d 445, applying the doctrine to a food store; Bon Air v. Time (S. D. Ga. 1969) 295 Fed. Supp. 704, applying the doctrine to an old hotel; Altoona v. Dun & Bradstreet (W. D. Pa. 1968) 286 Fed. Supp. 899, applying the doctrine to a corporation suing for damage to its credit; Fotochrome v. New York Herald Tribune (N. Y. Sup. Ct. 1969) 161 Misc. 2d 226, a case on almost all fours

with that here, where the doctrine was applied to a news story about the financial standing of the plaintiff corporation and where the paper got its erroneous data from reliable sources; United Medical v. C. B. S. (CA-4, 1968) 404 Fed. 2d 706, where the doctrine was applied to a medical laboratory, certiorari denied at 394 U.S. 921; Time v. McLaney (CA. Fla. 1969) 406 Fed. 2d 565, certiorari denied at 395 U.S. 922, on a holding that the doctrine applied to a matter of public interest; and Rosenbloom v. Metromedia (CA-3, 1969) 414 Fed. 2d 892, where again the doctrine was applied to a matter of public interest. In all cases, judgments were entered for the defendant news media.

There is no showing of any kind of "express" or "actual" malice, let alone "proof of convincing clarity". See Cobb v. Florida Publishing Company (C. C. Duval, 1968) 31 Fla. Supp. 112, and cases cited. None of the editors or defendants had any personal malice or ill will toward plaintiff and all handled the story relying completely on the Associated Press dispatch.

*McLaney,* supra, Washington Post v. Keogh (CA-DC. 1966) 365 Fed. 2d 965, and Thompson v. Evening Star (CA-DC. 1968) 394 Fed. 2d 774, all discuss the "chilling effect" on the free press and dissemination of news to the public of these libel suits (here plaintiff seeks $10,000,000) and why summary judgment is peculiarly appropriate. Summary judgment has just been upheld in the libel suit of Hill v. Lakeland Ledger (Fla. DCA-2, January 30, 1970) ——So.2d——.

Lastly, the plaintiff had been operating "in the red", had been having financial troubles for years, had given up its normal business activities, and was "winding up its affairs". The United Press had previously sent out a dispatch referring to plaintiff as "bankrupt". Other great national publications such as the Wall Street Journal, Newsweek, New York Times, and Time published stories referring to plaintiff as a "prey to raiders" and "sinking slowly — to the point of liquidation", as a "company going to pot" and to liquidation as "killing the company completely" and "striking the company flag". They used the terms "defunct", "collapse", "failure", "financially entangled" and "crumbling financial empire". The word "liquidation" is commonly associated with bankruptcy.

All the newspaper editors involved said they relied on the Associated Press dispatches and that in view of what they knew about plaintiff, they in good faith accepted the Associated Press designation of "now bankrupt". To the "common mind" under all the circumstances, the terms "liquidation" and "bankrupt" are practically synonymous along with the others used. The Associated Press editor who sent out the dispatches testified he believed the dis-

patches to describe accurately plaintiff's condition as he understood it when he distributed them.

Under all the circumstances, the Associated Press is likewise entitled to summary judgment under the last two grounds, particularly the *New York Times* rule. There is no proof of "convincing clarity" of "express malice" against any of the defendants.

The court finds, therefore, based on the pleadings, affidavits and depositions, that there is no genuine issue as to any material fact, and that the defendants are each entitled to summary judgment as a matter of law.

It is ordered that plaintiff take nothing by its suit; that each of said defendants go hence without day; and each of said defendants have and recover its costs from the plaintiff, Merritt-Chapman & Scott Corporation, such costs to be taxed by the court in subsequent proceedings herein.