### FINKEL v. SUN-TATTLER CO., Inc., et al.
No. 75-1164.
Circuit Court, Broward County.

June 3, 1976.

Quentin V. Long of Long & Finkel, Hollywood, for the plaintiff.

Harold B. Wahl of Wahl & Gabel, Jacksonville, and Hugh S. Glickstein, Hollywood, for the defendants.

VICTOR O. WEHLE, Circuit Judge.

On August 27, 1975 this court denied a motion for summary judgment prior to the time that plaintiff's deposition had been taken. After deposing plaintiff at length on February 6, 1976, defendants now renew their motion for summary judgment.

Plaintiff Finkel, a Broward County attorney, sues the newspaper, its publisher, editors, and reporter, for alleged libel per se because it published the following article on December 2, 1974 —

### FINKEL FACES PERJURY SUIT

HALLANDALE — A "suggestion of perjury or gross mistake" has been filed in a lawsuit in Broward Circuit Court against former City Attorney Charles Finkel because he denied in a court hearing last October he had any knowledge of alleged building code violations at the Dorsey Arms apartments.

Finkel issued his denial in a hearing October 30 before Broward Circuit Court Judge Lamar Warren after he had been subpoenaed to give testimony in a lawsuit involving the condominium apartment building.

In filing the lawsuit, Dorsey attorney Harry Schwenke "suggests to the court that the affiant, Charles A. Finkel, has either committed perjury or gross mistake in his verified motion to quash the subpoena."

Plaintiff then demanded a correction which the newspaper duly published (in the language requested by plaintiff) on December 14, 1974 —

That Washington Federal Savings and Loan Association of Miami Beach filed a complaint against DLA Corpn. and various individuals to foreclose merged mortgages. One of the individuals named as a defendant was Joseph E. Dorsey. Subsequently Dorsey's attorney served the undersigned with a subpoena for deposition and commanded the undersigned to bring all written communications, letters, memos, etc., received by me from any and all sources pertaining to the Dorsey Arms while I was city attorney for the city of Hallandale.

Subsequently, I filed a verified motion for protective order stating that I have reviewed the pleadings and that I do not have any knowledge as to any of the matters raised by the pleadings. (A copy of the motion is attached for your convenience); that it was my belief that this deposition was a part of a continuing effort to annoy and embarrass officials[1] of the city of Hallandale.

Mr. Dorsey's attorney then filed a responsive pleading stating that I had either committed perjury or gross mistake in my verified motion. This suggestion of Dorsey was based upon Dorsey's attempt again to inject into a mortgage foreclosure suit his personal vendetta against the city officials of the city of Hallandale.

As shown by the correction written by plaintiff himself, there is no dispute but that plaintiff was served with a subpoena to bring "all written communications, letters, memoranda, etc., received by me from any and all sources pertinent to the Dorsey Arms while I was city attorney for the city of Hallandale".

Subsequently, plaintiff filed a verified motion for protective order stating that he had reviewed pleadings in the Washington Federal case and that he had no knowledge as to "any of the matters raised by the pleadings" which would "be reasonably

---

1. In the responsive pleading as actually filed by plaintiff Finkel, he used the words "present and past officials" and at his deposition Finkel admitted that the "past officials" included him as past city attorney.

related thereto"; that there were no issues which would be "pertinent to the city of Hallandale"; and that he believed the deposition "is part of a continuing effort to annoy and embarrass the present and past officials of the city of Hallandale".

In response to the plaintiff's motion, Dr. Joseph A. Dorsey filed a "Response and Suggestion of Perjury or Gross Mistake". As alleged in paragraph 12 of plaintiff's complaint — "The response suggested to the court that plaintiff had either committed perjury or gross mistake in his verified motion".

On his deposition (pages 22-27), plaintiff identified certain communications which he had received while city attorney, including letters from Dr. Dorsey where he put plaintiff on notice of alleged improper activities in connection with the city's handling of the Dorsey Arms matter.

Further, plaintiff admitted that he was present at at least one meeting with other city officials where Dr. Dorsey had made vigorous complaint about the city's handling of Dorsey Arms (pages 19, 20); that before he became city attorney and while he was city attorney, he shared offices with his present partner who plaintiff knew had a business interest in the Dorsey Arms with Dr. Dorsey; that Dorsey was in the office several times a week and frequently mentioned to plaintiff the Dorsey Arms matter (page 31, et seq.).

At his deposition, plaintiff also identified several motions and other pleadings in the suit where complaint was made and details were given as to the city's handling of the Dorsey Arms (page 40, et seq.).

Notwithstanding, when plaintiff was subpoenaed to bring all the memoranda, instead of producing anything he filed a motion for protective order, stating, in his own words — "I have reviewed the pleadings and I do not have any knowledge as to any of the matters raised by the pleadings". Plaintiff also testified that although by then he had resigned as city attorney, he had voluntarily talked to the mayor and suggested the mayor consider likewise seeking a protective order (page 58, et seq.).

1. *New York Times doctrine*. It is clear from the story itself, the so-called correction requested and published by the newspaper, and plaintiff's own deposition, that this case involves a public figure or public official within the meaning of *New York Times v. Sullivan* (1964) 376 U. S. 254, and its progeny. Not only was plaintiff elected city attorney by the city commission of Hallandale (page 79) but he received a salary of $350 per month plus litigation fees which ran as high as $40,000 during one twelve month period (page 81). At the time his deposition was taken in February,

1975, he was still handling some city cases (page 80); while city attorney he handled many cases of great public interest (page 82), heading the list of which was the Dorsey Arms matter (pages 86-87); and in his request for correction, he referred to "past and present city officials", of which he admitted at his deposition he was one (pages 78-79). In *Rosenblatt v. Baer* (1966) 383 U. S. 75, the court held that the term "public official" applied to "any one on the public payroll". The annotations at 28 L.Ed.2d 885, page 896, entitled: "Who Is Public Official or Public Figure", and the later annotation on the same subject at 19 ALR 3rd 1361, cite many cases which make it clear that plaintiff is a public figure or public official within the meaning of *New York Times*.

The ALR 3rd Annotation is to the case of *Gilbert v. Goffi* (N. Y. 1964) 21 App. Div. 2d 517, 251 NYS2d 823, aff'd 207 NE2d 620, where the *New York Times* doctrine was held applicable to a partner in the mayor's law firm. Summary judgment was ordered on the theory —

> "It would be anomalous to hold that the mayor, as a public office holder, was precluded by the federal constitutional rule from suing in libel, but that his law partner was individually free to do so."

Among the cases cited in the annotation holding a municipal or county or city attorney to be a "public official" are —

A municipal civil service attorney was held to be within the *New York Times* rule in *Schneph v. New York Post Corp.* (1965) 16 NYS 2d 775), which, also without opinion, affirmed an order of the Supreme Court, Special Term, granting a motion by the defendant newspaper for summary judgment in a libel action brought by an attorney against newspaper publishers for publication of a defamatory editorial. The Court of Appeals merely noted that the attorney, on appeal, contended that "one of the many civil service attorneys appointed by a municipality is not a public official."

\* \* \* \* \*

\* \* \* a county (or in Louisiana parish) district attorney *(Garrison v. Louisiana* (1964) 379 U.S. 64, 13 L.Ed.2d 125, 85 S.Ct. 209, supra §2 (by implication); *Moity v. Louisiana* (1964) 379 U.S. 201, 13 L.Ed.2d 339, 85 S.Ct. 323 (revg per curiam 245 La. 546, 159 So.2d 149, a conviction on a charge of having defamed a district attorney, and citing *Garrison v. Louisiana* (US supra). *Fox v. Kahn* (1966) 421 Pa. 563, 221 A.2d 181, cert. den. 385 U.S. 935, 17 L.Ed.2d 215, 87 S. Ct. 292 (by implication).

\* \* \* assistant dean and professor in university law school. *Gallman v. Carnes,* 254 Ark. 987, 497 S.W.2d 47.

* * * city attorney. Tunnell v. Edwardsville Intelligencer, Inc., 99 Ill. App. 1, 241 N.E.2d 28.

* * * municipal attorney. *Edald v. Roelofs*, 120 Ill. App.2d 30, 256 N.E.2d 89.

In *Bishop v. Wometco* (Fla. DCA-3, 1970) 235 So.2d 759, 760, involving an "investigator", the court held —

> "The appellant, as a paid professional employee of the city of Miami, brought rimself into the public arena and subjected himself to criticism and fair comment, and the mere fact that certain portions of the editorial may have been inaccurate would not constitute a libel, per se."

See *Gibson v. Maloney* (Fla. DCA-1, 1972) 263 So.2d, 632, cer. den. 410 U. S. 974, where there is an excellent discussion of the *New York Times* doctrine. Judgment for the public figure was reversed by the Florida Supreme Court at 231 So.2d 823. The District Court of Appeal then directed judgment for the defendants at 263 So.2d., at 637.

It is interesting how the courts, since *Gertz v. Welch* (1974) 418 U. S. 323, have handled the question of who is a public official or public figure. In *Buchanan v. Associated Press* (USDCDC 1975) 398 Fed. Supp. 1196, the *brother* of presidential speech writer Pat Buchanan was held to be a public figure even though he was only a minor accountant for the Finance Committee to Re-elect the President. Other recent cases have concluded each of the following to be public figures — the children of the Rosenbergs, *Meeropol v. Nizer* (USDCSDNY 1974) 381 Fed. Supp. 29; an attorney who was general counsel for UMW when Tony Boyle was president, *Carey v. Hume* (USDCDC 1975) 390 Fed. Supp. 1026; and an opponent of floridation who had advocated his position in books, magazines and in court, *Exner v. American Medical Association* (Wash. 1974) 529P. 2d 863.

Plaintiff Finkel was officially elected city attorney by the city commission, received a salary of $350 per month, and large fees for handling litigation, and was still handling city cases and being paid by the city as late as the time his deposition was taken in Feburary 1976, long after the publications involved. Under *Rosenblatt v. Baer* (1966) 383 U. S. 75, holding that the term "public official" applies "to any one on the public payroll", Finkel was a public official.

But he says that the story was long after his official activities as city attorney and accordingly the rule does not apply.

In *Gertz v. Welch* 418 U. S. 323, 41 L.Ed.2d 789, it is said at pages 807-808 —

> An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case. And society's interest in the officers of the government is not strictly limited to the formal discharge of official duties. As the court pointed out in *Garrison v. Louisiana* (1964) 379 U.S. 46, 77, the public's interest extends to "anything that might touch on an official's fitness for office." ***** Few personal attributes are more germane to fitness for office than dishonesty, malfeasance or improper motivation even though these characteristics may also affect the official's private character. ***** The communications media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehoods concerning them.

Two cases were argued together in the United States Supreme Court, *Monitor Patriot Co. v. Roy*, 401 U. S. 265, and *Oca'a Star-Banner v. Damron*, 401 U. S. 295. In *Patriot*, at 28 L.Ed.2d 41-42, it is said —

> The Louisiana Supreme Court had held that these statements were not "criticisms . . . of the manner in which any one of the eight judges conducted his court when in session," but rather were accusations of crime and "personal attacks upon the integrity and honesty" of the judges. This Court rejected the proposed distinction:

> "Of course, any criticism of the manner in which a public official performs his duties will tend to affect his private, as well as his public, reputation. The New York Times rule is not rendered inapplicable merely because an official's private reputation, as well as his public reputation, is harmed. The public-official rule protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, anything which might touch on an official's fitness for office is relevant. Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character," 379 U.S., at 76-77, 13 L.Ed.2d at 134. [Cf. *Ocala Star-Banner* v. *Damron*, supra.]

> The consideration that led us thus to reformulate the "official conduct" rule of New York Times in terms of "anything which might touch on an official's fitness for office" apply with special force to the case of the candidate. Indeed, whatever vitality the *"official conduct"* concept may retain with regard to occupants of public office, cf. Garrison, supra, at 72 n.8, 13 L.Ed.2d, at 131, it is clearly of little applicability in the context of an election campaign.

In *Ocala Star-Banner v. Damron,* supra, the newspaper article merely referred to plaintiff as a "local garage owner" even though he happened to be the unpaid mayor of a small town and candidate for county tax assessor. The court said at 28 L.Ed.2d, at page 62 —

> The respondent urges us that a basis for distinguishing New York Times does exist, because the rule of that case applies only to "official conduct," and a charge of indictment for perjury committed during testimony in a federal civil rights suit is a purely "private" libel. This contention is disposed of by our decision today in Monitor Patriot Co. v. Roy, supra. In that case we held that a charge of criminal conduct against an official or a candidate, *no matter how remote in time or place,* is always "relevant to his fitness for office" for purposes of applying the New York Times rule of knowing falsehood or reckless disregard of the truth.

The term "official conduct" necessarily has been broadened, as above indicated. And there could be no "official conduct," in the technical sense, by a public figure who was not a public official.

Plaintiff sought to go on the public payroll as city attorney and was still receiving public compensation for handling city litigation long after the publications here. Moreover the publications related to his actions with respect to documents which came to him as city attorney. Once he became city attorney, went on the public payroll and took action as, and received documents, as, such city attorney, he is under the *New York Times* rule "no matter how remote the time and place," particularly if the publication related to documents received by him or action taken by him on the Dorsey Arms complaints when he was city attorney.

Plaintiff here, in the words of the Supreme Court decision in *Time v. Firestone* 47L.Ed.2d 154, is a public officer or a public figure who might be assumed "to have voluntarily exposed themselves to increased risk of injury for defamatory falsehood" by seeking and holding the office of city attorney (through election by the city commission) and staying on the public payroll through the time of the alleged libel here involved (by continuing to handle and be paid for city litigation even after formally resigning). He decided, in the words of *Gertz v. Welch* (1974) 418 U.S. 323, 41 L.Ed.2d 789 and 807 and 808, "to seek governmental office" and he

> "must accept certain necessary consequences of that involvement in public affairs. The communications media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehoods concerning them."

The entirety of the publications here involved plaintiff's activities in refusing to produce written documents that came to him on the Dorsey Arms in his capacity as city attorney, his claiming that such documents were not material to the issues in a law suit in the court, and one of the suit parties charging plaintiff with perjury or gross mistake for refusing so to produce.

It was only because plaintiff had "decided to seek governmental office" (the office of city attorney) and "that necessary involvement in public affairs" that he was served with the subpoena here calling for production of documents that came to him as such city attorney; that he decided to oppose such production; and thus caused Dr. Dorsey to file his suggestion of perjury. It is significant that plaintiff himself, on deposition, stated that he had handled "highly controversial matters which attracted public attention" while he was city attorney (p.82) and that none of those cases got more attention or publicity than the Dorsey Arms matter. (p.87). The Dorsey Arms matter was "like Abou Ben Adhem; its name led all the rest" (p.p.86,87).

2. *Calculated falsehood.* It may be claimed that the defendants here were guilty of some negligence or that they did not investigate sufficiently — yet they were not even guilty of "fault" under *Gertz.*

But a calculated falsehood or lie, with intent to harm through falsehood, is the standard set by the United States Supreme Court in *New York Times,* supra. See *Garrison v. Louisiana* (1964) 379 U.S. 64, at page 75; *Rosenbloom v. Metromedia* (1971) 403 U.S. 29, at page 52; and *Curtis v. Butts* (1967) 388 U.S. 130, page 153. Or, as stated in *Garrison* at page 75 — "the lie knowingly and deliberately published about a public official."

The Florida courts have entered summary judgment for the publisher on the flat basis that the plaintiff had not proven "a calculated lie by proof of convincing clarity." *West v. Florida Publishing Company* (1968) 30 Fla. Supp. 1; *Merritt-Chapman & Scott v. Associated Press* (1970) 33 Fla. Supp. 102; and *Moore v. Florida Publishing Company* (1970) 35 Fla. Supp. 180. See also *Damron v. Ocala Star-Banner* (1971) 35 Fla. Supp. 137, affirmed at 263 So.2d 291; and *Gibson v. Maloney* (Fla. DCA-1, 1972) 263 So.2d 632, at page 637.

As stated in *New York Times* at page 73, neither "factual error nor defamatory content," nor "a combination of the two," nor "injury to official reputation" combined with the others, are sufficient for plaintiff to recover.

In *Curtis v. Butts* (1967) 388 U.S. 130, at page 153, the court laid down the flat rule —

"We have 'limited recovery' to those cases where 'calculated falsehood' placed the publisher at odds with the premises of democratic government and with the orderly manner in which economic, social or political change is to be effected."

There must be intent to harm through a calculated lie.

The United States Supreme Court in *Cantrell v. Forest City Publishing Company*, 419 U.S. 245, 42 L.Ed.2d 419, equated plaintiff's burden with the necessity of proof of a calculated lie or falsehood. At page 427, the court again used the term "calculated falsehoods," and at page 428, "knowing falsehoods". And again in *Time v. Firestone*, infra, the term "calculated falsehood" is used.

3. *Application of New York Times doctrine here.* Under the undisputed facts then, let us apply the *New York Times* doctrine. It is well settled that newspapers are not held to the most technical accuracy and it is sufficient if the article is substantially correct.

We quote from page 897 of the annotation at 28 L.Ed.2d 885, et seq. —

In *Ocala Star-Banner v. Damron* (1971) 401 U.S. 295, 28 L.Ed.2d 57, 91 S.Ct. 628, a small daily newspaper serving four counties in rural Florida printed a story that a city mayor, then a candidate for county tax assessor, had been charged with perjury in a federal civil rights suit, and that the case had been held over until the following terms of court. The report was wholly false, but was substantially correct as to the mayor's brother. The newspaper published two retractions before the election. In the mayor's libel suit against the newspaper, the newspaper's area editor testified that, having worked for the paper for a little more than a month, he had never heard of the mayor's brother, and when a local reporter telephoned in the correct story, the editor inadvertently changed the brother's name to the mayor's. The mayor presented evidence tending to cast doubt on this explanation. The trial court ruled the case did not involve the mayor's official conduct. In reversing a judgment which affirmed a judgment in the mayor's favor, the Supreme Court said that the mayor was a "public official" both as mayor and as a candidate for county tax assessor. Moreover, it said, a charge of criminal conduct against an official or a candidate no matter how remote in time or place, is always relevant to his fitness for office for the purpose of applying the *New York Times* rule of knowing falsehood or reckless disregard of the truth.

See also *Garrison v. Louisiana* (1964) 379 U.S. 64, 13 L.Ed.2d 125, 85 S.Ct. 209, infra §9(b), involving criticism of judges' conduct of court business, in which the court said that the *New York Times* rule is not rendered inapplicable merely because an official's private reputation, as well as his public reputation, is affected by the defamatory statement.

It is significant that in *Ocala Star-Banner*, the story only named Damron as an individual and said nothing about his public capacity. The lower court held that *New York Times* did not apply for that reason. The Supreme Court of the United States reversed, however, holding that he was a public official both as unpaid mayor of a small town and as candidate for county tax assessor, and that since Damron was accused of perjury, that brought the case within the *New York Times*. The Florida District Court of Appeal then upheld a summary judgment for the newspaper at 263 So.2d 291. *(Cf. Menendez v. Key West Newspaper* (Fla. DCA-3, 1974) 293 So.2d 751, citing *Damron* and upholding summary judgment.)

As stated in the 1976 cumulative supplement to volume 20, Florida Jurisprudence, *Libel and Slander,* §55 —

> And the courts have declared that newspapers are not accountable for the failure to state the exact facts or most minute details respecting transactions related in their articles; that it is sufficient if the article is substantially true; and that inaccuracies not materially affecting the article's meaning are of no consequence. A workable test in this regard is whether the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced. Accordingly, where it is found that the articles would not have produced a different effect, as the common mind would naturally understand them, than that which they produced with the alleged false parts included, the articles, though not a model of objective journalism, will not be deemed libelous per se,

citing *McCormick v. Miami Herald Publishing Co.* (Fla. DCA-1962) 139 So.2d 197, and *Hammond v. Times Publishing Co.* (Fla. DCA, 1964) 162 So.2d 681.

As stated in *Pennekamp v. Florida,* (1946) 328 U.S. 331, 371, 90 L.Ed. 12959, 1316 —

> There is perhaps no area of news more inaccurately reported factually, on the whole, though with some notable exceptions, than legal news.

> Some part of this is due to carelessness, often induced by the haste with which news is gathered and published, a smaller portion to bias or more blameworthy causes. But a great deal of it must be attributed, in candor, to ignorance which frequently is not at all blameworthy. *For newspapers are conducted by men who are laymen to the law.* With too rare exceptions their capacity for misunderstanding the significance of legal events and procedures, not to speak of opinions, is great. But this is neither remarkable nor peculiar to newsmen. For the law, as lawyers best know, is full of perplexities.

> In view of these facts any standard which would require strict accuracy in reporting legal events factually or in commenting upon them in the press would be an *impossible one.*

Here the court does not find that there was any calculated falsehood or anything at the most other than possible slight technical inaccuracy. See *Merritt-Chapman & Scott v. Associated Press* (C. C. Dade County, 1970) 33 Fla. Supp. 102, and cases cited therein, upholding summary judgment when the defendants published that the plaintiff was "bankrupt" when as a matter of fact plaintiff claimed it was merely in liquidation. The court held that "to the common mind the terms 'liquidation' and 'bankruptcy' are practically synonymous" and that there was no proof of convincing clarity of calculated falsehood.

There is no dispute but that plaintiff here at the instance of Dr. Dorsey was served with a subpoena to produce; that plaintiff sought a protective order; and that Dr. Dorsey then served and later filed a "Suggestion of Perjury or Gross Mistake." With these admitted facts, it is difficult to see how any case for libel can be made.

Plaintiff complains that the article said the suggestion was filed "in a law suit in Broward County Circuit Court" and that that meant plaintiff had been criminally charged with perjury. The court does not interpret the article to mean that, but even if it could be stretched that far, the language used was at the most inaccurate or possibly negligent. Certainly, it was not calculated falsehood.

Next, the plaintiff argues that the suggestion had not been actually filed but only served on some twelve parties to the cause.

The reporter was furnished not only a copy of the suggestion but copy of a notice, showing service on plaintiff, that the suggestion would be heard by the court on December 4, 1974. Further the suggestion went into detail as to handling with plaintiff and his knowledge of Dorsey Arms city code violations while plaintiff was city attorney.

Just as the Supreme Court held in *State ex rel. Shevin v. Rawls* (Fla. 1976) 326 So.2d 173, that a notice of appeal filed *before* the entry of the judgment appealed from would not be dismissed but would "exist in a state of limbo" until judgment were entered, so here when the suggestion was served, that was determinative, not the filing with the clerk.

Not even the Florida appellate courts have been able to agree on the distinction between "service" and "filing" as indicated by

*Behm v. Division* (Fla. 1974) 288 So.2d 476, where the Supreme Court reversed a decision of our own Fourth District, and held that if a motion were *served* it stayed the time for appeal and held that *"service is the critical act"* rather than filing.

If the appellate courts have difficulty with the question, certainly a newspaper reporter could not be charged when he failed to appreciate the fine distinction between serving and filing. Moreover, when plaintiff made a written demand for correction, he likewise stated that Dorsey's attorney "then *filed* responsive *pleading* stating I had either committed perjury or gross mistake" (page 77).

Lastly, plaintiff seems to argue that there was some technical difference between the communications he had received, the pleadings in the Washington Federal case[2], and building code violations. Since the communications related to alleged building code violations and there were motions and depositions in the Washington Federal suit which charged building code violations (page 41, et seq.), it is difficult to appreciate this fine distinction. Whatever it may or may not be, it does not constitute "calculated falsehood which placed the publication at odds with the premises of democratic government and with the orderly manner in which economic, social or political change is to be effected." *Curtis v. Butts* (1967) 388 U.S. 130, at 153.

4. *Courts, not juries, determine constitutional protection.* The United States Supreme Court has repeatedly emphasized that it is for the courts to determine the applicability of constitutional protection lest the press be at the mercy of the passions of juries. In

---

**2.** In the suggestion of perjury and notice of hearing thereon furnished the reporter, Dorsey said Finkel "had either committed perjury or gross mistake" and went on to allege: "Defendant Joseph E. Dorsey, M.D., personally on several occasions communicated with Charles A. Finkel in regard to matters at the Dorsey Arms relating to parking and other violations of city ordinances * * * * * further conversations were held with Mr. Finkel in his office regarding the production of documents.

*Pleadings and allegations in this case* reflect that "violations of the building code and other ordinances were allowed to continue even though the City of Hallandale was notified of these violations, all while Charles A. Finkel, Esquire, was the City Attorney."

This was privileged as part of a judicial proceeding. See 20 Fla. Jur., *Libel and Slander,* §§67 and 72.

*New York Times,* supra, the court reviewed the evidence "to determine whether it could constitutionally support a judgment for respondent." 376 U.S. at 284-285.

In *Rosenblatt,* supra, determination of what was a "public official" was for the court in order to "lessen the possibility that a jury will use the cloak of a general verdict to punish unpopular ideas." (383 U.S. 88, f.n.15).

In *Monitor Patriot,* supra, the determination of "relevance" was for the court, since a jury "is unlikely to be neutral with respect to the content of speech and holds a real danger of becoming an instrument for the suppression of these 'vehement,' caustic and sometimes unpleasantly sharp attacks; *New York Times* at page 270, which must be protected if the guarantees of the First and Fourteenth Amendments are to prevail." 401 U.S. at 277.

In *Time v. Pate* (1971) 401 U.S. 279, at 291, the court said the question of "rational relevance" was for the court so that the publishers would not be "virtually at the mercy of the unguided discretion of a jury."

In *Gertz v. Welch* (1974) 418 U.S. 323, at 349, the doctrine of presumed damages was eliminated because it "invites juries to punish unpopular opinion."

In the recent case of *Time v. Firestone* (3-2-76) 47 L.Ed.2d 154 — where the court held Mrs. Firestone was not a public figure and consequently *New York Times* did not apply — the court vacated the judgment in her favor at 305 So.2d 172 and remanded the case to the Florida Supreme Court for a factual determination as to whether the defendant magazine was guilty of fault or failure to exercise due care — the standard under *Gertz* for a purely private individual. The Supreme Court recognized that the existence of "fault" was a *judicial* determination, and at footnote 9 to Mr. Justice Powell's concurring opinion four of the eight participating Justices flatly held —

> "Unless there exists some basis for a finding of fault *other* than that given by the Supreme Court of Florida there can be no liability."

The last paragraph of the principal opinion says —

> "But in the absence of a finding in some element of the state court system that there was fault, we are not inclined to *canvass* the record to make such a determination in the

first instance * * * the judgment of the Supreme Court of Florida is vacated * * *."

And both *Gertz* and *Firestone,* while setting up the standard for a private individual plaintiff of actual damage and fault (as opposed to presumed damage and libel per se), again re-iterated that as to public officials and public figures, they must prove, by proof of convincing clarity, the *Curts v. Butts* standard of calculated falsehood.

The *Firestone* case involved not a public official nor a public figure but a private individual. And much less is required for a private individual libel plaintiff to recover.

Both in *Firestone* and here alleged erroneous reporting of a judicial proceeding was involved.

The Supreme Court of Florida at 305 So.2d 172, at 178, found erroneous reporting and "fault" in Firestone as follows —

Furthermore, this erroneous reporting is *clear and convincing evidence of the negligence* in certain segments of the news media in gathering the news. Gertz v. Welch, Inc., supra. Pursuant to Florida law in effect at the time of the divorce judgment (Section 61.08, Florida Statutes), a wife found guilty of adultery could not be awarded alimony. Since petitioner had been awarded alimony, she had not been found guilty of adultery nor had the divorce been granted on the ground of adultery. A careful examination of the final decree prior to publication would have *clearly demonstrated* that the divorce had been granted on the grounds of extreme cruelty, and thus the wife would have been saved the humiliation of being accused of adultery in a nationwide magazine. *This is a flagrant example of journalistic negligence.*

Yet the Supreme Court of the United States reversed and vacated the judgment of the Supreme Court of Florida, holding there had not been a proper "finding of fault." And four of the eight participating justices held that "unless there exists some basis for finding of fault *other* than that given by the Supreme Court of Florida *there can be no liability."* Footnote 9 to Powell concurring opinion.

If the erroneous reporting as found by the Florida Supreme Court in *Firestone* was not even sufficient for libel liability in the case of a private individual, how can the much lesser degree of fault alleged here be sufficient in the case of a public official?

As stated by the United States Supreme Court in *Pennekamp,* supra, (90 L.Ed.2d at 1316) long before *New York Times* —

"Any standard which would require strict accuracy in reporting legal events factually or in commenting upon them in the press would be an *impossible* one."

The *Pennekamp* opinion also pointed out that a great deal of the error in legal news was because of "ignorance which is *not* at all blameworthy" and newsmen cannot be expected to appreciate these fine distinctions. There was no calculated falsehood here — nor even legal fault within the meaning of *Gertz* and *Firestone*. As held in *Pennekamp,* the standard sought to be imposed by plaintiff in legal reporting in the press "would be an *impossible* one."

Even plaintifff, an attorney, in his request for retraction of December 4, 1974 (Exhibit B to his complaint) specifically says — "Mr. Dorsey's attorney then *filed* a responsible *pleading* stating I had either committed perjury or gross mistake in my verified motion." Since plaintiff, a lawyer, so uses the terms "filed" and "pleading" he cannot complain of a layman's use of the terms.

A case decided on April 23, 1976, by the Fourth District Court of Appeal, *Palm Beach Newspapers, Inc. v. Early,* 334 So.2d 50, which went up from Broward County, is pertinent here.

In that case Early, county school superintendent of Palm Beach County, sued the West Palm Beach Newspapers, Inc., their editors and reporters, for libel. I was the trial judge, and I allowed the case to go to the jury, which awarded Early $1 million. The case was appealed, and the District Court of Appeal for the Fourth District unanimously reversed, held Early entitled to nothing, and directed entry of judgment for the defendants.

I quote from the opinion —

Both papers, through their respective editorial and news staffs, embarked upon a concerted campaign admittedly designed to bring about the removal of Mr. Early from his elected position. In pursuance of this objective, the defendants published over a period of approximately fourteen months several hundred news articles and editorials, all of which were generally hostile to or critical of Early and many of which were of a defamatory nature. (p.2)

This standard, applicable to appellee Lloyd F. Early as a public officer, has been explicated in later cases. In Garrison v. Louisiana, 379 U.S. 64 (1964), it was said , at 74, "only those false statements made with the high degree of awareness of their probable falsity demanded by New York Times may be the subject of either civil or criminal

sanctions." As stated in a footnote in Gertz v. Robert Welsh, Inc., 418 U.S. 323 (1974) (footnote 6 at 334):

> In St. Amant v. Thompson, 390 U.S. 727,731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), the Court equated reckless disregard of the truth with subjective awareness of probable falsity: "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."

> "Many of the written articles and cartoons, caustic and pejorative as they were, nonetheless had a basis in fact and thus were not false."

> "***while most of the articles and cartoons can fairly be described as slanted, mean, vicious, and substantially below the level of objectivity that one would expect of responsible journalism, there is no evidence called to our attention which clearly and convincingly demonstrates that a single one of the articles was a false statement of fact made with actual malice as defined in the New York Times case."

A careful reading of (a) plaintiff's own deposition here, and (b) the cases cited herein, impels the conclusion that just as in *Early*, plaintiff has no cause of action here.

The United States Supreme Court has ruled as a matter of law that the following did not meet the "constitutional malice" standard — falsity, defamatory content, failure to retract and investigatory failure in *New York Times*; ill will and negligence in *Garrison*, supra, and *Henry v. Collins* (1965) 380 U.S. 356 (the latter without even requiring oral argument); falsity in *Butts*, supra; failure to investigate in *Beckley v. Hanks* (1967) 389 U.S. 81 (again without oral argument) and *Butts*; defamatory content in *Greenbelt v. Bresler* (1970) 398 U.S. 6; and mistaken identity in *Ocala Star-Banner*, supra, where the wrong man was accused of being indicted for perjury.

Construing the case most strongly against the defendants, there is no basis on which a jury could find proof of convincing clarity of calculated falsehood, or even "fault" under *Gertz*.

The decisions of the United State Supreme Court and of the Florida Court make it clear that summary judgment is the remedy in a situation of this kind.

It is accordingly ordered that plaintiff take nothing by his suit; that each of the defendants go hence without day; and that each of the defendants have and recover its or his costs from the plaintiff, such costs to be hereafter taxed by this court.